**Charles C. ROUSE, Appellant,**

v.

**Dale C. CAMERON, Superintendent, Saint Elizabeths Hospital, Appellee.**

**No. 20962.**

United States Court of Appeals District of Columbia Circuit.

Argued June 21, 1967.

Decided Sept. 1, 1967.

Mr. Charles R. Halpern, Washington, D. C., with whom Mr. Edward E. O'Neill, Washington, D. C. (both appointed by this court), was on the brief, for appellant.

Mr. Thomas Lumbard, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee. Messrs. Oscar Altshuler, John A. Terry and Scott R. Schoenfeld, Asst. U.

S. Attys., also entered appearances for appellee.

Mr. Thomas P. Alder, Washington, D. C., was on the brief for American Orthopsychiatric Ass'n as amicus curiæ.

Before BAZELON, Chief Judge, DANAHER, BURGER, WRIGHT, MCGOWAN, TAMM, LEVENTHAL and ROBINSON, Circuit Judges, sitting en banc.

BAZELON, Chief Judge:

Appellant was tried in 1962 in the Court of General Sessions (then the Municipal Court for the District of Columbia) before a judge sitting without a jury on the misdemeanor charge of carrying a weapon without a license.[1] He was acquitted by reason of insanity and was thereupon committed without a hearing of any kind to Saint Elizabeths Hospital pursuant to D.C.Code § 24–301(d).[2] On April 12, 1967, he brought this habeas corpus action in the District Court,[3] alleging, *inter alia*, that "he did not voluntarily and knowingly introduce the insanity defense or authorize his attorney to do so * * *," and that therefore his commitment under D.C.Code § 24–301(d) was barred by Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962). Two additional independent grounds for relief were urged: (1) that because his attorney acquiesced in the introduction of the insanity defense against his wishes, he was deprived of a fair trial; and (2) that in any event D. C.Code § 24–301(d) is unconstitutional. The District Court denied relief on all grounds. In this appeal, we need not

---

**1.** D.C.Code § 22–3204 (1961).

**2.** If any person tried upon an indictment or information for an offense, or tried in the juvenile court of the District of Columbia for an offense, is acquitted solely on the ground that he was insane at the time of its commission, the court shall order such person to be confined in a hospital for the mentally ill. D.C.Code § 24–301(d) (1961).

We note that appellant has remained at Saint Elizabeths for almost five years, even though the maximum sentence for carrying a weapon without a license is only one year.

**3.** Rouse brought an earlier habeas corpus action seeking release on the grounds that he was receiving no treatment for his mental condition at Saint Elizabeths Hospital, and that he had recovered his sanity. The District Court denied relief and on appeal we remanded the case for further proceedings. See Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1967). Relief was again denied, and Rouse's appeal from that denial, No. 20,881, was heard with the present appeal. Our disposition of this appeal renders moot the issues raised in No. 20,-881.

consider the latter two grounds since we think the District Court erred in concluding that Lynch v. Overholser does not apply because petitioner "acquiesced in the assertion of the insanity defense."

I

The pertinent facts are not seriously disputed. Petitioner, aged eighteen, was stopped at approximately 1:45 a. m. on Fourteenth and Harvard Street, N. W., by a police officer who had seen him carry a small but heavy suitcase. According to Rouse, he opened the suitcase only on the officer's order.[4] The case was found to contain a fully loaded .45 caliber automatic pistol and several hundred rounds of ammunition.[5] The officer took Rouse into custody and seized the case and its contents. After consultation with his court-appointed attorney, a motion to suppress was filed on the ground that the search was incident to an unlawful arrest.

The motion to suppress was never heard. Instead, shortly after it was filed, new counsel retained by petitioner's mother moved for a pretrial mental examination under D.C.Code § 24–301(a).[6] An affidavit of petitioner's mother stated her belief that her son was mentally ill and that he could be benefited by treatment. The undisputed testimony at the

habeas hearing shows that counsel retained by Rouse's mother did not confer with appellant prior to filing this motion; that petitioner did not even know new counsel's identity when he saw him at the hearing on the motion for the pretrial mental examination; and that he thought he was still being represented by assigned counsel.

The court ordered the requested examination at D. C. General Hospital, which subsequently reported that Rouse was "able to understand the charges against him, and capable of assisting counsel in his own defense." But the report further stated that he was suffering from a passive-aggressive personality disorder and that the crime was the product of this mental illness.

According to petitioner's undisputed testimony, he did not confer with his new attorney until just a few moments before the trial commenced. At trial, the Government presented the testimony of the arresting officer and of the examining psychiatrist from D. C. General Hospital. The officer did not say and was not asked about the circumstances under which the suitcase was opened. The examining physician testified on direct and cross-examination that Rouse was mentally ill, dangerous, and treatable.[7] He reiterated the hospital's

---

4. See petitioner's affidavit filed with his pretrial motion to suppress the seized evidence.

5. Also found in the suitcase were two electric drills, six bits, one hack saw, two blades, a twenty-five foot extension cord, and a pair of leather gloves.

 According to the psychiatrist who testified at petitioner's trial, Rouse carried the weapon because he felt he needed protection. However, when petitioner was asked at trial why he carried the gun, he refused to answer. There is no evidence that Rouse ever used the weapon or the tools in the commission of a crime.

6. D.C.Code § 24–301(a) (1961).

 Whenever a person is arrested, indicted, [or] charged by information * * * for or with an offense and, prior to the imposition of sentence or prior to the expiration of any period of probation, it shall appear to the

court from the court's own observations, or from prima facie evidence submitted to the court, that the accused is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense, the court may order the accused committed * * * for such reasonable period as the court may determine for examination and observation and for care and treatment if such is necessary * * *.

7. Consideration of a person's likely danger to the community is appropriate in civil commitment proceedings. See, e.g., D.C.Code §§ 21–544, 21–545 (Supp. V, 1966). But such a consideration is plainly irrelevant in a criminal trial. There, the issues are whether the accused committed the acts charged and, if so, whether the acts were the product of a mental disease or defect. Nor

written conclusion that the crime was a product of Rouse's mental illness. These conclusions were not challenged by defense counsel.

Petitioner and his mother testified for the defense. She stated on direct examination that her son had been a disciplinary problem to the family for some time, that he had several charges pending against him in Virginia, and that he had purchased the gun he was carrying with a bad check. She also testified that in her opinion the psychiatrist was correct and that her son needed treatment. When the defendant took the stand, his own counsel elicited his admission that he had purchased the gun with a bad check. Then counsel asked Rouse, "What was it you wanted to tell his Honor * * * in connection with this proceeding?"

A. I had just one thing to say, Mr. Laughlin. I believe the doctor did say I was able to aid in my own defense and I have not had a chance to talk to Mr. Laughlin, consult him since he's been my attorney. I had Mr. Ochipinti, who was doing a fairly good job with me; at least, discussing what he was going to do. *I have not talked with Mr. Laughlin or my mother about this case. I have no idea what they were going to do in court or anything else, and I think I would have the right to defend myself and, as it was, so far I haven't been able to say a word up until now.*

Q. *Mr. Defendant, do you feel the situation would have been different here had you talked with me, sir? Would it have changed anything here had you talked with me?*

A. *Well, I think, in the first place, I had a motion in for illegal search and seizure which I wasn't given a chance to present to the Court. I don't know what happened to my other attorney,*

*Mr. Ochipinti. Either my mother or you did something—one · of you; I don't know which one of you. But, anyway, as I was picked up, they did not have a warrant for me, search or arrest, which they did, and the gun was in a suitcase, a closed suitcase. The police picked me up. They told me to open the suitcase. This policeman—I had not been doing anything suspicious, anything that would cause him to arrest me. And, therefore, I believe this constitutes illegal search and seizure and, also, would require a suppression of the evidence since the evidence obtained was by the manner of an illegal search.*" (Emphasis supplied.)

Counsel proceeded to elicit from Rouse his agreement that he was mentally ill and in need of treatment.[8] Rouse said: "I think I need treatment, but I also think that because of the charges I have pending out in Virginia * * * that I would like to get—clear this matter up here now and go over there and face those charges growing out of this." Counsel continued to lead his client: "But it is your testimony—in other words, you feel sure that your mother is correct, isn't she, that you need treatment and that you might be cured of this mental ailment?" Rouse responded: "To some extent her testimony is correct, yes. But what I feel—actually, this may be psychological. * * * I don't know. But I feel that I've been lured into this thing because I haven't had a chance to say a word."

At this point, counsel stated for the record his explanation regarding why he waived the motion to suppress made by petitioner's prior assigned counsel:

I want to say that I took it upon myself to waive any hearing on the motion to suppress because of the circumstances in this case, because our belief

---

is treatability an appropriate consideration at a criminal trial. Its relevance may even be doubtful in a civil commitment determination.

8. Counsel also asked: "And * * * you indicated last week that you didn't want to go to jail; you wanted to go to either

D.C. General Hospital or St. Elizabeths Hospital." Rouse answered: "That's quite true." Since all the testimony shows that Rouse had not conferred with this attorney, we assume that the attorney received this information from Rouse's mother.

—the belief of the mother and my belief and * * * [the U. S. Attorney's] belief—is that this man needs treatment. * * * The District Attorney was willing that that be argued but I saw no purpose in it.

The defense thereupon rested,[9] waived final argument, and urged the court to find Rouse not guilty by reason of insanity, and to commit him accordingly.

## II

The record plainly reveals that the lawyer retained by the petitioner's mother invoked the insanity defense at her direction against the express wishes of petitioner; that petitioner made a substantial effort to divorce himself from the decisions which his mother and the lawyer she retained made in his behalf; and that petitioner's desire for treatment neither negated nor contradicted his wish to defend against the criminal charge or his belief that he had been "lured into" an insanity plea.[10]

 Mandatory commitment under D.C.Code § 24–301(d) is permissible only if a *"defendant* acquitted on the ground of insanity * * * *has affirmatively relied on a defense of insanity."* Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962) (emphasis supplied). The Supreme Court "held that Congress did not intend to allow automatic commitment * * * *when the defense * * * is thrust upon a defendant who objects."* Cameron v. Mullen, —— U.S.App.D.C. ——, 387 F.2d 193, decided March 2, 1967 (emphasis supplied). We think the District Court's determination that petitioner himself sought the introduction of the insanity defense at this trial was clearly erroneous. And, in light of petitioner's apparent disabilities, including, for example his lack of financial means and learning in the law, and the likelihood that he has been suffering from some mental illness, we also reject the court's finding that petitioner evidenced his acquiescence in the insanity defense by waiting almost four years to attack the validity of his mandatory commitment.[11]

 It follows that the trial court had no authority to commit the petitioner following his acquittal by reason of insanity. See Cameron v. Mullen, *supra.* The Government is free, of course, to seek his commitment now under the 1964 Hospitalization of the Mentally Ill Act.[12]

We reverse the judgment below and remand with instructions to grant the writ, conditioned upon giving the Government a reasonable opportunity to institute civil commitment proceedings if it wishes.

So ordered.

---

9. In resting his case, counsel stated: "We have nothing else, your Honor, and, in my judgment, I don't believe it requires any argument. It is plain, your Honor, under all the reported cases that this man does need treatment and we do have an excellent institution at St. Elizabeths Hospital, and I believe that since he is young in years, he can overcome this, and I think it would be a serious danger to inflict him on the community." Perhaps because counsel abandoned any defense on the merits and because he seemed so anxious to have his client committed as mentally ill and dangerous, the trial judge became confused as to the nature of the proceeding before him. He asked: "And the purpose of this—this is a trial?" Thus, it clearly appears that counsel succeeded in converting the criminal trial into a commitment proceeding without any of the safeguards of civil commitment.

10. We note that, according to the affidavit of petitioner's original court-appointed attorney filed in the habeas corpus hearing below, petitioner never suggested the possibility of raising the insanity defense in their discussion regarding the case.

11. Rouse testified at the habeas corpus hearing that he first became aware of the legal significance of what had occurred at his trial when he read a newspaper account of this court's decision in Cameron v. Mullen, *supra.* He also stated that he told counsel who represented him in prior habeas corpus actions about the manner in which he had been committed, and that they told him he had "no legal grounds" for habeas corpus and that the commitment "was over and done with."

12. D.C.Code §§ 21–501—21–591 (Supp. V, 1966).

DANAHER, Circuit Judge (dissenting):

I wish to emphasize my view, once again,[1] that this case should not have occasioned our concern in the first place. I had earlier set forth as an Appendix[2] the opinion delivered by Judge Holtzoff after he heard testimony by the Government's psychiatrist concerning the extensive treatment afforded to Rouse, and the evidence offered by Dr. Marland, the expert called by the appellant. Dr. Marland testified that Rouse had had "several attorneys" who had requested his expert services. He believed Rouse should not be regarded as mentally ill, indeed he said, if Rouse, after release, should duplicate his earlier conduct, the place for him is jail.

The trial judge then continued the case for some two weeks to permit an examination to be made by Dr. Bunge, a member of the Mental Health Commission. The latter testified that Rouse had been suffering from a mental disorder when he was arrested in September, 1962, but by November, 1965, he was no longer mentally ill.

The treatment at St. Elizabeths had been such, and recovery had so far progressed, that Dr. Bunge felt further hospitalization would "stifle his future development." He found that Rouse did not come within the diagnosis of the Government's expert, indeed he would no longer be a menace if released.

So it was that Judge Holtzoff's November, 1965 opinion[3] reflected the sheer common sense of a judge who had carefully explored the claims of Rouse and his attorney that the evidence showed Rouse should be released. The trial judge noted the progress Rouse had made under St. Elizabeths care, then urged him to resume cooperation with the staff, and gave assurance that if the staff authorities failed thereafter to recommend a conditional release, the judge himself would entertain a renewed request.

We should have affirmed, right then and there. But had we done so, we would not have had an opportunity in No. 19863 to order a remand for a hearing and findings "concerning treatment" and its adequacy respecting a patient as to whom there had been three different diagnoses by three different experts. Although there has been no suggestion from any member of this court that a mental patient, committed after a criminal proceeding, is not entitled to treatment, a majority purported to find a basis for its action in the "District of Columbia Hospitalization of the Mentally Ill Act," 78 Stat. 944, as amended. I pointed out in my dissent[4] the fallacy of that predicate, especially since the Act in so many words says that the term "mentally ill person" shall *not* "include a person committed to a private or public hospital in the District of Columbia by order of the court in a criminal proceeding."

In the hearing after remand many of St. Elizabeths leading experts testified as did others. Again, Rouse failed to make out a case, notwithstanding which he brought his appeal in our No. 20881. My colleagues now moot that appeal.[5] If the Dutch took Holland in the first opinion, *supra* note 1, the leak in the dike

1. See my dissent in Rouse v. Cameron, 125 U.S.App.D.C. 366, 377, 373 F.2d 451, 462 (1966, as amended, 1967).

2. *Id.* at 382–383, 373 F.2d at 467–468.

3. *Supra* note 2.

4. 125 U.S.App.D.C. at 381 n. 14, 373 F. 2d at 466 n. 14.

5. Senior Circuit Judge Fahy, concurring, attached to the order of dismissal, entered September 1, 1967, his separate statement which reads:

"In view of the relation of this case to Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451, where I joined in Chief Judge Bazelon's opinion for the court, I desire to state now that I have come to entertain serious doubt that the care and treatment provisions of the 1964 Hospitalization of the Mentally Ill Act, D.C.Code § 21–562 (Supp V, 1966), apply in terms to a person committed to a mental institution in a criminal proceeding. While nothing in the Act indicates the slightest intention on the part of Congress that care and treatment

finally in No. 20881 submerged the erstwhile victors, for they cannot surmount the record there made after remand.[6]

Realization of the likely development of that circumstance, no doubt, is not unrelated to the institution of another *habeas* petition filed April 11, 1967. Begun after three previous *habeas* actions, nearly five years after the original Rouse arrest, we find *for the first time* a claim that Rouse's mother and his privately retained counsel had "railroaded" him into St. Elizabeths. After a hearing, judgment having gone against him, Rouse now has presented the instant appeal in our No. 20962. Seizing upon this as a vehicle, a majority again reverses, and this court has come full cycle!

> should not be accorded to one committed in such a proceeding, the matter appears simply to have been left for separate congressional consideration.
>
> "I remain clearly of the opinion that the obligation of treatment as spelled out in our opinion in Rouse v. Cameron, supra, applies as well to one committed by court order in a criminal proceeding as to one committed in a civil proceeding; that is, the correctness of our holding in that case is not dependent upon the 1964 Act."

Thus I wish to dissociate myself from what has been happening here. I reiterate previously expressed views that Congress should create an entity to deal with all problems[7] arising with respect to those alleged to be mentally ill when charged with the commission of a criminal offense. In particular, I reassert the firm conviction that those seeking exculpation from criminal responsibility for their offenses on the ground of lack of mental capacity should be required affirmately to assert and establish that defense.

BURGER and TAMM, Circuit Judges, concur in the foregoing dissenting opinion.

6. The disposition by Judge Holtzoff was right in the first place. In August 1966, one mentally ill Charles Whitman, as was notoriously publicized, from a University of Texas tower, killed or wounded at least 36 people after having shot his wife and his mother. What Rouse with his loaded .45 pistol was to do with his hundreds of rounds of ammunition, we do not know.

7. Cf. my opinion in No. 20573, Dobson v. Cameron and Stultz v. Cameron, 127 U.S. App.D.C. 324, 383 F.2d 519.