Roy JUSTIN, Appellant,

v.

Louis JACOBS, Appellee.

No. 22008.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 18, 1969.

Decided May 18, 1971.

Mr. Stephen A. Weiswasser, Washington, D. C. (appointed by this Court) for appellant.

Mr. Robert A. Ackerman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and Roger E. Zuckerman, Asst. U. S. Atty., were on the brief, for appellee. Messrs. David G. Bress, U. S. Atty. at the time the record was filed, John A. Terry and Thomas C. Green, Asst. U. S. Attys., also entered appearances for appellee.

Before McGOWAN, ROBINSON and MacKINNON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In April, 1958, appellant was indicted on a charge of taking indecent liberties with a child.[1] A month later, he was committed to the District of Columbia General Hospital for a determination of his competence to stand trial.[2] The Hospital staff found him competent, but added that he was a "sexual psychopath with a compulsive need for involvement with little girls." Proceedings were then conducted under the Sexual Psychopath Act;[3] appellant was found to fall within the definition of the Act and was committed to Saint Elizabeths Hospital.[4] An appeal from the commitment decision was taken, but was later dismissed by agreement.

Appellant remained at Saint Elizabeths until November, 1958, when he was placed on convalescent leave. He eloped in November, 1959, but was returned to Saint Elizabeths in April, 1963. In July, 1967, appellant brought this habeas corpus action, alleging that his original commitment was unlawful because he was mentally ill in 1958, and because there was insufficient evidence of dangerousness to justify commitment. He also challenged his continued confinement in the Hospital, charging that he was being given inadequate treatment, that he was being held in an improper place, and that the Hospital wrongfully refused to release him as cured. The District Court, for reasons considered herein, found against appellant on all points, and discharged the writ. This appeal followed.

I

While the appeal was pending, appellant was unconditionally released from Saint Elizabeths Hospital.[5] This circumstance dictates inquiry, at the outset, as to whether the case is now moot, or the federal habeas corpus power is otherwise impaired. Upon careful examination into the matter,[6] we conclude upon each inquiry in the negative.

As the Supreme Court recently put it, "[s]imply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cogniza-

---

1. D.C.Code § 22–3501(a) (1967).

2. *Id.* § 24–301(a) (1967), as amended (Supp. IV, 1971).

3. *Id.* §§ 22–3503 to 3511 (1967), as amended (Supp. IV, 1971).

4. The criminal charge was dropped without objection in September, 1958.

5. The discharge followed a period of about a year during which appellant was given first accompanied, and later unaccompanied, city privileges. It followed, too, by one day, his arrest in Virginia for allegedly selling the drug LSD to teen-age girls. Va.Code § 54–446.4 (1950).

6. After receipt and study of supplemental memoranda from the parties.

ble interest in the outcome." [7]  But, as the Court has made equally plain, the case remains "live" if a party may thereafter encounter adverse effects of the event in issue.[8]  This principle has experienced frequent application in criminal cases where the potential "collateral consequences" [9] of a conviction preserve the issue as a real one and the party's stake in its resolution as substantial.[10]

This court has adopted the same test of mootness in civil litigation.  In Hudson v. Hardy,[11] the petitioner had been subjected to disciplinary measures in prison.  Although by the time we decided the case the petitioner had been transferred to another penal facility, we held that, even treating the petition as one for habeas corpus, the case was not moot.  We said that even though the punishment had terminated, the records thereof continue to exist, and that "if [petitioner's] punishment was without cause, he is punished anew each time his record is used against him." [12]

■ Thus we find unpersuasive any attempt to divorce the instant case from the mainstream of mootness doctrine simply because the commitment under attack was civil.  As cases like *Hudson*

demonstrate, the consequences which may flow from the contested event, not the form of action the contest assumes, are the factors relevant to a determination of mootness.  And the consequences of appellant's commitment under the Sexual Psychopath Act may indeed be serious for him.  As long as the commitment stands on the record, he faces state constitutional and statutory provisions which purport to bar the mentally ill from voting.[13]  He faces a challenge under the federal jury statute disqualifying those "incapable, by reason of mental or physical infirmity, to render satisfactory jury service." [14]  In some states, he faces a special examination when he applies for a driver's license.[15]  Similarly, in the District of Columbia, he faces special provisions limiting his access to.a gun license.[16]  Quite obviously, his past commitment may facilitate another in the future.

It is, of course, by no means clear that appellant will—or lawfully could—be confronted by these obstacles or others like them.  But "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of

7.  Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).

8.  See cases cited *infra* note 10.

9.  Carafas v. LaVallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968).

10.  Benton v. Maryland, 395 U.S. 784, 790–791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) ; Street v. New York, 394 U.S. 576, 579–580 n. 3, 89 S.Ct. 1354, 22 L.Ed. 2d 572 (1969) ; Sibron v. New York, 392 U.S. 40, 53–58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ; Carafas v. La-Vallee, *supra* note 9, 391 U.S. at 237–238, 88 S.Ct. 1556; Ginsberg v. New York, 390 U.S. 629, 633–634, n. 2, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) ; Pollard v. United States, 352 U.S. 354, 358, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957) ; United States v. Morgan, 346 U.S. 502, 512–513, 74 S.Ct. 247, 98 L.Ed. 248 (1954).

11.  137 U.S.App.D.C. 366, 424 F.2d 854 (1970).

12.  *Id.* at 368, 424 F.2d at 856.  We declined to resolve the mootness issue ourselves, but remanded it to the District Court for decision under prescribed guidelines, "[s]ince ultimate decision may turn on facts not of record here, and since the suggestion of mootness was not made until our original opinion had already issued * * *."  *Id.* at 367–368, 424 F.2d at 855–856.

13.  *E. g.*, Va.Const. § 23 and Va.Code § 24.1–42 (Supp.1970) (barring "insane persons") ; *cf.* Md.Const. art. 1, § 2 (barring persons "non compos mentis").

14.  28 U.S.C. § 1865(b) (4) (Supp. V, 1970).

15.  *E. g.*, Va.Code § 46.1–360 (1950).

16.  District of Columbia Police Regulations § 52.5(c) (2) (1969).  See also D.C.Code §§ 22–3207, 3210(3) (a) (1967).

the challenged conviction," [17] and we perceive no reason why that rule should not govern where the challenge is to a commitment as a sexual psychopath.[18] To be sure, judicial nullification of appellant's commitment may not completely immunize him from future problems emanating therefrom. At the very least, however, it would put him in much better position to ward off burdens that otherwise might easily overtake him.

■ We hold that appellant has a stake in the outcome of this lawsuit substantial enough to keep it alive. However, as he concedes, the fact that he is not presently in the Hospital's custody does moot some of the issues he had previously raised—specifically, the claims that he was being given inadequate medical treatment, and was being confined in an improper place. But the issue as to the validity of his original commitment as a sexual psychopath did not, upon his release, fall "ignominiously in the limbo of mootness." [19]

■ Nor, notwithstanding repeated references in the federal habeas corpus statutes to applicants "in custody," [20] can there be any doubt as to our continuing power to award appropriate relief in this case. The case at bar seems indistinguishable from Carafas v. LaVallee,[21] in which the Supreme Court defined the "in custody" requirement in terms of custody when litigation begins.[22] Carafas, convicted of burglary in 1960, applied for federal habeas corpus in 1963, while in jail. He was placed on parole in 1964, from which he was discharged in 1967, when his sentence expired. Throughout this period, the case was wending its way to the Supreme Court—the writ of certiorari was granted just twelve days after Carafas' freedom became unconditional. The Court held "that under the statutory scheme, once the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application." [23] By the same token,

---

17. Sibron v. New York, *supra* note 10, 392 U.S. at 57, 88 S.Ct. at 1900. The Court there pointed out that in Pollard v. United States, *supra* note 10, it had "abandoned all inquiry into the actual existence of specific collateral consequences [of a criminal conviction] and in effect presumed that they existed," *id.* at 55, 88 S.Ct. at 1898. The Court concluded that the "mere possibility" of collateral consequences was enough to keep the case alive. See also Benton v. Maryland, *supra* note 10, 395 U.S. at 790–791, 89 S.Ct. at 2060, where the Court held that although the possibility of counting both of petitioner's two convictions against him in a later recidivist proceeding "may well be a remote one, it is enough to give this case an adversary cast and make it justiciable."

18. The Supreme Court has noted "the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." Sibron v. New York, *supra* note 10, 392 U.S. at 55, 88 S.Ct. at 1899. For the reasons given in text we think that appellant's commitment as a sexual psychopath harbors much the same potential. We note also that that commitment rested on a judicial determination that appellant fit the statutory definition of "sexual psychopath":

"a person, not insane, who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his sexual impulses as to be dangerous to other persons because he is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his desire." D.C.Code § 22–3503(1) (1967), as amended (Supp. IV, 1971). The "course of repeated misconduct in sexual matters" connotes sexual practices for which appellant could have been prosecuted as a criminal; indeed, he was so charged, see page 1018, *supra*. To this must be added the burden of a reputation for mental instability and dangerousness in a society in which personal responsibility is all-important.

19. Parker v. Ellis, 362 U.S. 574, 577, 80 S.Ct. 909, 911, 4 L.Ed.2d 963 (1960) (Mr. Chief Justice Warren, dissenting).

20. See, *e. g.*, 28 U.S.C. §§ 2241, 2242, 2243, 2252, 2254 (1964), as amended (Supp. V, 1970).

21. *Supra* note 9.

22. See text *infra* at note 23.

23. Carafas v. LaVallee, *supra* note 9, 391 U.S. at 238, 88 S.Ct. at 1559. The Court overruled Parker v. Ellis, *supra* note 19, which had held to the contrary.

since appellant was in custody at Saint Elizabeths Hospital when his habeas corpus petition was filed in the District Court, we did not lose jurisdiction to decide his appeal when the Hospital thereafter unconditionally released him.

## II

We turn, then, to the merits. Appellant's first challenge goes to the kind of mental condition which, with other accompaniments, may justify confinement under the Sexual Psychopath Act. The Act applies only to persons "not insane," [24] and appellant claims that this phrase must be interpreted to mean "not mentally ill", citing our decision in Millard v. Harris.[25] He argues that the Millard standard should have been applied both in the original 1958 commitment and the 1967 habeas corpus proceedings.

We agree with appellant that in his 1967 bid for release from the hospital, the Millard interpretation of the words "not insane" should have been used by the court. This exact issue was very recently decided by this court in Norwood v. Jacobs.[26] Norwood had been committed to Saint Elizabeths Hospital as a sexual psychopath in 1957. In 1969, he sought habeas corpus, and the District Court ordered his discharge.[27] This court affirmed, holding that Millard operates retroactively to prohibit the continued confinement of a mentally ill person under the Sexual Psychopath Act, and in Norwood "[t]he evidence [was] uncontroverted that appellee [was] mentally ill." [28] If, then, appellant were still in custody, the case at bar would have to be remanded for a determination as to whether appellant is mentally ill under the Millard interpretation of the Act.

However, we have come to the conclusion that because appellant is not presently detained under the Act, his mental condition in 1967 is no longer an issue in this case. The reason that the case is not moot is the possibility of collateral consequences which would follow appellant, a possibility stemming from a judgment in 1958 that he was a sexual psychopath.[29] We are unable to see how a determination that appellant was entitled to be released in 1967 from confinement under the Act would alleviate the collateral consequences that keep the case alive. Were a court to determine that appellant was mentally ill in 1967, and therefore wrongly incarcerated under the Act, the validity of his original commitment would not have been altered. Appellant, after all, has now been discharged by the hospital, and since his discharge indicates that "he has sufficiently recovered so as to not be dangerous to other persons," [30] a declaration that he should have been released because he was mentally ill in 1967 cannot be of much additional value to him in combating the collateral consequences which follow adjudication as a sexual psychopath.

We come next to the question of the standard, as respects mental condition, that should have been used in the original proceeding in 1958. No challenge is made to the 1958 finding that appellant was "not insane" under the statute; instead, appellant claims that the Millard interpretation of the Sexual Psychopath Act must be applied retroactively, and that his original commitment be declared improper if he was "mentally

24. See note 18, *supra*.

25. 132 U.S.App.D.C. 146, 406 F.2d 964 (1968).

26. 139 U.S.App.D.C. 162, 430 F.2d 903 (1970).

27. The District Court's order deferred the discharge for 30 days to enable the Government to institute civil commitment proceedings under the 1965 Hospitalization of the Mentally Ill Act, D.C.Code §§ 21–501 to 591 (1967), as amended (Supp. IV, 1971), and provided for Norwood's retention in custody until the conclusion of such proceedings.

28. Norwood v. Jacobs, *supra* note 26 at 162, 430 F.2d at 903.

29. See Part I, *supra*.

30. D.C.Code § 22–3509 (1967).

ill" in 1958. We disagree, because the considerations underlying the *Millard* holding would not be furthered by applying that interpretation to a 1958 commitment.[31]

We decided in *Millard* that the words "not insane" in the Sexual Psychopath Act had to be construed to mean "not mentally ill" primarily to create a constitutional relationship between that Act and the 1964 Hospitalization of the Mentally Ill Act.[32] Had we done otherwise, we would have faced the difficult constitutional question whether it violates equal protection to commit and hold one mentally ill person under the Hospitalization Act, with its many procedural advantages, while holding another mentally ill person under the Sexual Psychopath Act, which contains no such benefits.[33] As we said in Cross v. Harris,[34] in explaining *Millard*:

> In *Millard* we declined to leap to the conclusion that there was no longer any permissible role for the Sexual Pychopath Act. Instead, we sought to save the statute by construing it to avoid the equal protection problems which would arise from an overlap with the new civil commitment law. * * * Thus, the 1948 Sexual Psychopath Act now applies only to those who are *not* "mentally ill," while compulsory treatment of those who *are* "mentally ill" is governed by the 1964 Act. This construction restores the original relationship of mutual exclusivity between sexual psychopath commitments and other civil commitments.

Since the equal protection problem did not exist in 1958—a time when the civil commitment provisions applied only to those who were "insane persons"[35]—the reason that underlies *Millard* does not apply to appellant's original commitment.

It is true that the *Millard* court spoke not only of the equal protection impetus to reinterpretation of the term "not insane," but also of the "broad changes [since 1948] in the attitudes and language with which both lawyers and psychiatrists approach mental disturbances."[36] But we believe that *Millard's* acknowledgement of the growing sensitivity of courts and doctors to the difficulty of drawing distinct lines between kinds of mental disturbances—especially where indefinite deprivation of personal liberty may be the result[37]—was primarily aimed at explaining the forces which led to the 1964 Hospitalization Act. We do not believe that *Millard* rests on the changes in attitudes and methods of dealing with mental disturbances that have occurred since the passage of the Sexual Psychopath Act.

---

31. The Supreme Court has pointed out that there are three factors to be considered in deciding whether a new decision should be applied retroactively: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967); Desist v. United States, 394 U.S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); see also Gaither v. United States, 134 U.S.App.D.C. 154, 176–177, 413 F.2d 1061, 1083–1084 (1969); *cf.* Bolton v. Harris, 130 U.S.App.D.C. 1, 12–13, 395 F.2d 642, 654–655 (1968). "Foremost among these factors is the purpose to be served by the new * * * rule," Desist v. United States, *supra*, 394 U.S. at

249, 89 S.Ct. at 1033. Since we believe that the purpose of *Millard* would not be served by applying it to appellant's original commitment, we have no occasion to consider the other factors in this case.

32. D.C.Code §§ 21–501 to 591 (1967), as amended (Supp. IV, 1971).

33. Millard v. Harris, *supra* note 25, 132 U.S.App.D.C. at 152–153, 406 F.2d at 970–971.

34. 135 U.S.App.D.C. 259, 263, 418 F.2d 1095, 1099 (1969) (footnotes omitted) (emphasis in the original).

35. Act of Aug. 9, 1939, ch. 620, 53 Stat. 1293, formerly D.C.Code §§ 21–308 to 325 (1961), repealed, 78 Stat. 953 (1964).

36. Millard v. Harris, *supra* note 25, 132 U.S.App.D.C. at 149, 406 F.2d at 967.

37. *Id.* at 149–151, 406 F.2d at 967–969.

Therefore, we find no reason in *Millard* to allow appellant to attack his 1958 commitment because he was there judged "not insane" instead of "not mentally ill." We are reenforced in this conclusion by the difficulty of satisfactorily ascertaining now whether appellant was mentally ill in 1958. The cold record of the 1958 hearing would probably be of little help in the determination since, as *Millard* pointed out, the terms used to describe appellant in that day have a different meaning and reflect different assumptions today.[38] Furthermore, it might not be possible to gather the experts on appellant's 1958 mental condition; and even if they could be assembled, memories surely have faded over 13 years.

It may be well to note that this conclusion does not cast any doubt whatsoever on our recent *Norwood* decision.[39] There, as in *Cross* and *Millard* themselves, the petitioner attacked his ongoing confinement; in the instant case appellant can attack only his original commitment. We fully agree with *Norwood* that *Millard* must be applied retroactively, where the issue concerns the continuing confinement under the Sexual Psychopath Act of one committed before the *Millard* decision. We hold only that appellant, committed in 1958, cannot successfully attack the original commitment decision simply on the basis of a pre-

*Millard* but proper-at-the-time interpretation of the Act.[40]

### III

Appellant's second challenge concerns essentially the sufficiency of the evidence introduced against him at the 1958 commitment hearing. In particular, appellant claims that there was insufficient evidence of "a course of repeated misconduct in sexual matters" to justify the conclusion that appellant was "dangerous to other persons."[41] The Government's primary reply to this claim is that it is not cognizable in habeas corpus because, as noted above, appellant failed to take an appeal from the 1958 commitment hearing. In the particular circumstances of this case, we are persuaded that the Government is correct.

We recognize that the failure to take an appeal, standing alone, does not necessarily bar federal habeas corpus relief.[42] The rule that habeas corpus cannot be used to substitute for appeal, we have been instructed, is not a rule "defining power, but one which relates to the appropriate exercise of power."[43] Here the refusal to exercise power seems most appropriate.[44] From the record before us, it is apparent that the claim of insufficiency of the evidence was to have been the basis of an appeal from the original commitment decision,[45] yet that

---

38. *Id.*

39. *Supra* note 26.

40. Accord, Warring v. Colpoys, 74 App. D.C. 303, 122 F.2d 642, cert. denied, 314 U.S. 678, 62 S.Ct. 184, 86 L.Ed. 543 (1941).

41. D.C.Code § 22–3503(1), quoted *supra* note 18.

42. *E. g.*, Kaufman v. United States, 394 U.S. 217, 220 n. 3, 89 S.Ct. 1068, 22 L. Ed.2d 227 (1969); Fay v. Noia, 372 U.S. 391, 438–439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Tucker v. United States, 138 U.S.App.D.C. 345, 348 n. 21, 427 F.2d 615, 618 n. 21 (1970).

43. Bowen v. Johnston, 306 U.S. 19, 27, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939), quot-

ed in Fulwood v. Stone, 129 U.S.App.D.C. 314, 317 n. 8, 394 F.2d 939, 942 n. 8 (1967).

44. *Cf.* Cassidy v. United States, 428 F.2d 585 (8th Cir. 1970); Battaglia v. United States, 428 F.2d 957 (9th Cir.), cert. denied, 400 U.S. 919, 91 S.Ct. 181, 27 L. Ed.2d 158 (1970); United States ex rel. Kenny v. Follette, 410 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 940, 90 S. Ct. 951, 25 L.Ed.2d 120 (1970). See generally Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1068–1070, 1103–1112 (1970).

45. In a motion for bail pending appeal filed in this court on October 3, 1958, appellant, through his retained counsel, argued that the substantial questions to be raised on appeal included the sufficiency of the

appeal was dismissed by agreement between the Government and appellant's retained counsel.[46] Neither appellant nor his counsel, either here or at the hearing in the District Court, has made the slightest attempt to show that appellant did not participate in the decision to drop the appeal in 1958. Appellant has never even alleged, for example, that he was not consulted, or that his will was overborne, or that his wishes were ignored.[47] And at the time of the 1958 commitment, the record discloses that appellant had been pronounced "mentally competent to understand the proceedings against him and to properly assist in his own defense" by D. C. General Hospital.[48] We can conclude from all this only that appellant and his counsel deliberately and intelligently declined to raise the sufficiency of the evidence claim by appeal. In these circumstances, we see no reason to disturb the District Court's conclusion that appellant's "claims of * * * erroneous rulings by the Court which conducted the hearing were waived by his failure to pursue a direct appeal."

Affirmed.

MacKINNON, Circuit Judge:

I concur in the result but wish to set forth some additional views.

In 1948 Congress enacted the Sexual Psychopath Act for the District of Columbia providing for the indeterminate commitment of sexual psychopaths until cured. This Act defined a sexual psychopath to mean:

> * * * a person, *not insane,* who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his sexual impulses as to be dangerous to other persons because he is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his desire.[1] (Emphasis added.)

D.C.Code § 22–3503, 62 Stat. 347.

Under the statute the indeterminate commitment of such persons could be obtained through court proceedings initiated by the United States Attorney in the United States District Court of the District of Columbia by the filing of a statement in writing setting forth the facts tending to show that such person is a sexual psychopath (D.C.Code § 22–3504). Such persons are afforded counsel at every stage of the proceeding (D.C.Code § 22–3505) and two qualified psychiatrists are appointed by the court to make an examination of any person charged, who is defined and considered as a "patient" (D.C.Code § 22–3506). The result of the psychiatric examination is filed with the court and in the event that

> both psychiatrists state that the patient is a sexual psychopath, or if both state that they are unable to reach any conclusion by reason of the partial or complete refusal of the patient to submit to thorough examination, or if one states that the patient is a sexual

---

evidence to show that appellant had committed acts of misconduct and was a sexual psychopath within the definition of the Act.

46. The "Agreement of Dismissal" was filed in this court on December 29, 1958.

47. *Compare* Kaufman v. United States, *supra* note 42, 394 U.S. at 220 n. 3, 89 S.Ct. 1068 (petitioner had appealed his conviction, but his appointed counsel did not assign as error the admission of certain evidence on the grounds of unlawful search and seizure, although there had been objection to the evidence at trial; petitioner sought by personal letter to have the Court of Appeals pass on the claim, but it apparently did not do so); Rouse v. Cameron, 128 U.S.App.D.C. 283, 287, 387 F.2d 241, 245 (1967) ("petitioner made a substantial effort to divorce himself from the decisions which his mother and the lawyer she retained made in his behalf").

48. Letter from D. C. General Hospital staff to District Judge Schweinhaut, June 10, 1958. So far as we can determine, appellant has never challenged this conclusion.

1. Persons covered by this definition constitute a very small group of persons, but a group that is very dangerous to society.

psychopath and the other states that he is unable to reach any conclusion by reason of the partial or complete refusal of the patient to submit to thorough examination, then the court [D. C.Code § 22–3507]

conducts a hearing to determine whether the patient is a sexual psychopath (D.C. Code § 22–3508). Such hearing is conducted by the court without a jury unless a jury is demanded by the patient or the United States Attorney. The usual rules of evidence applicable to judicial proceedings apply and if the "patient" is determined to be a sexual psychopath the statute provides that "the court *shall* commit him to Saint Elizabeths Hospital to be confined there until" such time as the Superintendent of Saint Elizabeths Hospital

> finds that he has sufficiently recovered so as to not be *dangerous to other persons,* provided if the person to be released be one charged with crime or undergoing sentence therefor, the Superintendent of the hospital shall give notice thereof to the judge of the criminal court and deliver him to the court in obedience to proper precept. D.C. Code § 22–3509. (Emphasis added.)

Not "dangerous to other persons," as used in the statute, obviously refers back to the definition contained in section 22–3503 and means not dangerous to other persons because he is *not likely to attack or otherwise inflict injury, pain or other evil on the objects of his desire.*

It should be noted that the Sexual Psychopath Act when enacted was complementary with those laws providing for the commitment of "insane" persons[2] and the overall intent of Congress was to *add* to insane persons, an additional class of persons *who were to be committed* to Saint Elizabeths Hospital, *i. e.,* sexual psychopaths in addition to insane persons. Such legislation assumed that insane persons, who except for their being insane were within the definition of sexual psychopaths, would be confined and it merely added another class of patients subject to indeterminate commitment, *i. e.,* until sufficiently recovered so as not to be dangerous to other persons.

In 1965 Congress enacted the Act for the "Hospitalization of the Mentally Ill" in the District of Columbia and in so doing substituted "mental illness" for "insane" as the basis for commitment (D.C. Code § 21–545(b), 79 Stat. 756). "Mental illness" was defined to mean "a psychosis or other disease which substantially impairs the mental health of a person" (D.C.Code § 21–501) and the statute provided:

> If the court or jury finds that the person is mentally ill and, because of that illness, is *likely to injure himself or other persons* if allowed to remain at liberty, the court *may* order his hospitalization for an indeterminate period, or order any other alternative course of treatment which the court believes will be in the best interests of the person or the public.

D.C.Code § 21–545(b) (Emphasis added).

The change by the 1965 Hospitalization Act in the standard from "insane" (D.C. Code § 21–315 (1940 ed.), 53 Stat. 1296) to one of "mental illness" doubtlessly had the effect of encompassing a larger group of persons and in doing so may have trespassed into that small group of persons who were covered by the original definition of sexual psychopaths. This overlapping group would be composed of

---

2. Since the Sexual Psychopath Act only provided for the commitment of persons with such propensities who were "not insane," it was completely complementary to the "insane" standard prescribed by the statute for the commitment of insane persons. *Cf.* D.C.Code § 21–315 (1940 ed.), 53 Stat. 1296. In this respect the District of Columbia Sexual Psychopath Statute as enacted in 1948 followed exactly the format of the Psychopathic Personality Statute in the State of Minnesota from which it was patterned. *See* Minnesota Laws, 1939, c. 369. The constitutionality of the Minnesota Sexual Psychopath Statute had been upheld in Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940).

those who were covered by the original Sexual Psychopath Act and who were "not insane" but were "mentally ill." To the extent that the "mentally ill" standard of the 1965 Hospitalization Act is applied to the Sexual Psychopath Act and limits the application of that law by excluding persons originally defined as sexual psychopaths, I would not release any person within that group from his commitment as a sexual psychopath (not insane) *unless he were found to be not mentally ill and commitable* under the new definition. I believe that to be the true intent of Congress. Certainly Congress in passing the Hospitalization Act did not intend to bring about a wholesale release of sexual psychopaths. In this connection it should also be pointed out that while both standards encompass persons likely *to injure* others and authorize their confinement until cured, the "injury" standards of the two statutes are not completely complementary. The sexual psychopath definition is broader in that in addition to persons who are likely to injure others it also includes persons who are *"likely to attack or otherwise inflict \* \* \* loss, pain, or other evil on the objects of his desire"* (emphasis added) and provides for the mandatory commitment of such persons (D. C.Code § 22–3508). However, commitment of those mentally ill under the Hospitalization Act is discretionary (D.C. Code § 21–545(b)).

This portion of the wider definition in the Sexual Psychopath Act is particularly applicable to that very small group of persons who have an uncontrollable propensity to commit sexual attacks and otherwise engage in perverse and other sexual type assaults that some people consider do not cause visual physical "injury." Some people argue that many of such sick type acts do not cause "injury." In this respect, they argue for a very narrow definition of "injury" which in many instances would exempt them from the Sexual Psychopath Act because they are mentally ill, and would also *not* confine them under the discretionary authority conferred by the Hospitalization of the Mentally Ill Act. To release this group of people from their commitment as sexual psychopaths because they may be said to be mentally ill (and possibly not considered commitable because they were not likely to cause actual physical injury to others in the more limited sense of the mental illness definition) would be a complete negation of the true intent of Congress in the Sexual Psychopath Act. Consequently, those persons who meet the definition of being mentally ill *and* who under the discretion provided by the hospitalization statute are not to be confined, if they are likely to cause injury under the broader standard of the original Sexual Psychopath Act, I would continue their commitment under the Sexual Psychopath Act. Otherwise, they would be relegated to prosecution as minor criminals and the sentences for the normal offenses in such cases are all too frequently in the misdemeanor category. These misdemeanor statutes, and even some felony statutes, do not adequately consider or treat the exceedingly dangerous propensity of the sexual psychopath in conferring punishment. Such persons should not be considered as criminals but as patients and as such they should be confined until cured. I believe that to have been the intent of Congress in legislating in this area.