**In re Jerome CURRY, Patient.**

**No. 71–1798.**

United States Court of Appeals, District of Columbia Circuit.

Aug. 21, 1972.

Mr. Robert J. Golten, Washington, D. C., for appellant.

Mr. James F. Flanagan, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed and John A. Terry, Asst. U. S. Atty., were on the pleadings, for appellee.

ON FURTHER CONSIDERATION OF APPELLANT'S MOTION FOR SUMMARY REVERSAL FOLLOWING REMAND AND ON APPELLEE'S SUGGESTION OF MOOTNESS

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

BAZELON, Chief Judge:

In an earlier opinion we considered only one of the issues arising from petitioner's involuntary confinement at St. Elizabeths Hospital. Following his hospitalization as an emergency patient, petitioner raised a number of difficult contentions concerning the procedures which had been invoked to authorize his commitment and concerning what he termed an absence of any meaningful program of treatment during the period of his confinement. We considered first the argument that petitioner had a right to treatment even during the period of emergency hospitalization, and held on October 19, 1971, that the "overall therapeutic process—which begins with observation and diagnosis to determine whether treatment is required—must be initiated as soon as the period of involuntary hospitalization begins." [1] In resolving this question at the outset, we hoped to insure that during our consideration of the remaining questions Curry would either be participating in a program of diagnosis and treatment (which is, after all, the assumption on which the power of civil commitment purports to rest), or that he would no longer be subject to involuntary and pointless hospitalization. Accordingly, we turn now to the remaining contentions.

Curry's protracted skirmish with St. Elizabeths Hospital began on September 27, 1971, when he appeared at the George Washington University Hospital, stating that he heard voices in his head telling him to "go die," and "leave," and complaining of electric devices in his head which were controlling his behavior. The events which led up to Curry's hospitalization at St. Elizabeths were described briefly in our earlier opinion:

> After interviewing Curry, a doctor at the hospital advised him, for reasons that the papers before us do not make entirely clear, that he could not be admitted for treatment at George Washington. The doctor further suggested that he file an application for treatment at St. Elizabeths, which Curry was unwilling to do. The doctor then executed an application for emergency hospitalization, and sent him in an ambulance to St. Elizabeths. There is some indication that Curry reaffirmed at St. Elizabeths his desire to be treated as a voluntary patient, although at argument the government disclaimed any knowledge on the issue. The hospital admitted Curry as an involuntary, emergency patient pursuant to D.C. Code § 21–522.

452 F.2d at 1361 (footnote omitted).

In light of our opinion of October 19 remanding the case to the District Court for a hearing forthwith on Curry's allegations that he was receiving no more than custodial care, the District Court held an evidentiary hearing, and heard testimony of petitioner and a number of staff members at St. Elizabeths. On the basis of that testimony, the court made findings of fact and concluded that Curry was "receiving medical and psychiatric treatment consistent with the diagnosis of the experts and that such treatment is something more than 'custodial care.'" We express no opinion on the adequacy or validity of the District Court's findings in view of petitioner's concession that "though in some respects we disagree with Judge Corcoran's findings, on balance we do not contest that in this case the patient was receiving something (though not much) more than 'custodial care.' Thus, we do not object to the Government's suggestion that the

[1]. In re Curry, 147 U.S.App.D.C. 28, at 31, 452 F.2d 1360, at 1363, n. 3 (1971).

Court need not further consider this facet of the case." [2]

## I.

Petitioner's encounter with involuntary civil commitment can best be understood by dividing into four stages the procedure applied to his case. The first stage was confinement for up to a maximum of 48 hours under the authority of D.C.Code § 21–522. That 48-hour period of confinement must be predicated on an application by a police officer, public health official, or "physician of the person in question," [3] who asserts that hospitalization is required because the person is or appears to be mentally ill and dangerous to himself or others.

At the end of the initial 48-hour period, the hospital refused to release Curry and proceeded to the second stage by applying under § 21–523 for a court order "authorizing the continued hospitalization of the person for emergency observation and diagnosis for a period not to exceed 7 days from the time the order is entered." In response to the hospital's petition, the district court entered an order authorizing the 7-day commitment.[4]

Instead of releasing Curry at the end of the seven days of confinement under § 21–523, the hospital moved the case into the third stage by initiating judicial proceedings for long-term hospitalization. Section 21–528 authorizes the hospital to hold a person "during the course of the judicial proceedings," even if the 7-day period of emergency commitment has already lapsed.

The fourth stage involves the judicial proceeding itself, which must be commenced by the filing of a petition under § 21–541 with the Commission on Mental Health, and which may lead ultimately to a judicial determination that the person is mentally ill and dangerous. Curry's seemingly inexorable advance toward long-term civil commitment was finally halted at this fourth stage. On November 5, 1971, Curry was unconditionally discharged from the hospital because the Commission had concluded on the previous day that he was mentally ill but not dangerous.

On this appeal Curry raises a direct challenge only to the procedures invoked during the first and second stages—the stages of emergency hospitalization. He has no apparent quarrel with the third and fourth stages, except insofar as those procedures were predicated on, and made possible by, his presence in the hospital pursuant to what he considers an erroneous invocation of the first two stages.

## II.

Before turning to the merits of Curry's challenge to these first two stages, we must consider the government's two-pronged suggestion that the case is now moot. First, the government would have it that Curry lost the right to litigate the validity of his confinement during the first stage (48 hours) and the second stage (7 days) as soon as the hospital moved into the third stage by initiating judicial proceedings. The government's theory is that confinement under the third stage rests exclusively on the

2. Petitioner's Opposition to Suggestion of Mootness at 7–8 (lodged Dec. 16, 1971).

3. In Curry's case, the application was made by a physician; but whether he was a physician of the person within the meaning of the statute is a question in dispute. In view of our resolution of this appeal, we find it unnecessary to resolve this question.

4. Petitioner also challenges the adequacy of the judicial hearing which he was afforded under § 21–525. The district court

concluded that the only purpose of such a hearing is to determine whether the statutory procedure has been followed, i. e. whether the application for admission under § 21–521 and the certificate under § 21–522 are sufficient on their face. This Court rejected that position in In re Barnard, 147 U.S.App.D.C. 302, 455 F. 2d 1370 (1971), holding that the constitution requires a hearing to determine whether the confinement is based on probable cause.

pendency of judicial proceedings, and that once such proceedings have been set in motion, confinement is authorized under § 21-528 "[n]otwithstanding any other provision of this subchapter * * * *." Even if the hospital or the district court had blundered during the first or second stage, the government reasons, confinement under the third stage would still be proper so long as the procedural requirements of the third stage had been fully observed. Curry concedes that there was no independent error in stage three.

The second prong of the mootness argument would terminate the litigation because of developments in the fourth stage: namely, Curry's unconditional release from St. Elizabeths.

■ We are convinced that neither of the government's theories are sufficient to support a finding of mootness. At issue is not the validity of present confinement, since Curry is no longer confined. But he does challenge the validity of the prior emergency confinement as a person mentally ill *and dangerous to himself or others.* That prior confinement may have continuing collateral consequences which should be dispelled if the confinement was, in fact, unlawful.[5] The case clearly presents

sufficient adversariness to avoid mootness in the constitutional sense. *Cf.* SEC v. Medical Committee for Human Rights, 404 U.S. 403, 407, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); Benton v. Maryland, 395 U.S. 784, 788, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). And since the case presents questions of substantial importance which are likely to recur and which, by their very nature, are effectively impossible to reach while the emergency hospitalization is taking place, principles of sound judicial administration require us to entertain the appeal. *See* Alton & Southern R. Co. v. International Association of Machinists, 150 U.S.App.D.C. 36, 463 F.2d 872 (1972).[6]

### III.

■ On the merits, it is clear that petitioner is entitled to relief. Curry argues that his emergency, involuntary hospitalization was invalid because he was willing to accept voluntary treatment. The principle which controls our disposition was established in another recent case involving a denial of voluntary treatment:

> On May 19, 1972, the petitioner filed with this court a petition for a writ of prohibition which would direct the

5. *Cf.* Justin v. Jacobs, 145 U.S.App.D.C. 355, 356–358, 449 F.2d 1017, 1018–1020 (1971) (commitment as sexual psychopath may impose burdens on voting, jury service, obtaining a driver's license or gun license); Note, Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672, 1680 (1970). In its suggestion of mootness, the government relies exclusively on Justin v. Jacobs, but that case hardly supports the government's conclusion. There, the Court held that issues concerning the right to treatment of a person previously confined as a sexual psychopath were mooted by the petitioner's discharge from hospitalization. That result does not conflict with the result we reach here, since Curry's contention of a right to treatment was resolved by our earlier opinion, which issued while he was still in confinement. And the alleged denial of a right to treatment presents uncertain collateral consequences where the patient has already been released. In one

recent case the petitioner's sole contention concerned the right to treatment and, upon his release from the hospital, we held that this contention had become moot. *See* In re Richardson, No. 22,611, dismissed as moot Dec. 23, 1970. While reaching that same conclusion on the right-to-treatment contention, the Court in *Justin* specifically held that issues relating to the procedures which led up to confinement were not moot, because of the collateral consequences which might flow from that confinement.

6. *See also* City of Lafayette v. SEC, 147 U.S.App.D.C. 98, 110, 454 F.2d 941, 953 & n. 26 (1971); Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 36, 420 F.2d 597, 604 (1969); Matthews v. Hardy, 137 U.S.App.D.C. 39, 45, 420 F.2d 607, 613 (1969); Jeanette Rankin Brigade v. Chief of Capitol Police, 137 U.S. App.D.C. 155, 157, 421 F.2d 1090, 1092 (1969); Friend v. United States, 128 U.S.App.D.C. 323, 388 F.2d 579 (1967).

District Court to discontinue any further proceedings for the purpose of committing the petitioner as an involuntary patient. It appears that the petitioner voluntarily sought admission into a public hospital on a full-time basis; it further appears that proceedings were initiated which would result in the petitioner being committed involuntarily. Because the statutory scheme which provides for voluntary admission [D.C.Code § 21–511] was created so as to encourage admission without legal proceedings, the steps taken in the case at bar were in error.

Lightfoot v. Sirica, No. 72–1460 (D.C. Cir. May 25, 1972) (footnotes omitted). That principle, which is amply supported by considerations of policy [7] and the statute's evident intention of encouraging voluntary admissions, requires the invalidation of Curry's involuntary hospitalization.

To be sure, it is not entirely clear that Curry reaffirmed at St. Elizabeths his desire to be treated as a voluntary patient. But there is no dispute that he did voluntarily present himself at George Washington University Hospital and request treatment. And nothing in the record indicates that he resisted treatment at St. Elizabeths.[8] Under these circumstances, we conclude that the government should bear the risk of non-persuasion that Curry resisted voluntary treatment.

Under the principles established in *Lightfoot*, Curry's detention as an emergency, involuntary patient under § 21–

522 must be declared null and void. The case will be remanded to the district court for entry of an order requiring the hospital to amend its records to indicate that Curry was not validly detained as an involuntary patient.

So ordered.

---

7. *See, e. g.*, F. Lindman & D. McIntyre, The Mentally Disabled & the Law 107 et seq.; Curran, Hospitalization of the Mentally Ill, 31 N.C.L.Rev. 274, 277 (1953); *cf.* Note, "Voluntary" Hospitalization of the Mentally Ill, 66 Nw.U.L.Rev. 429 (1971), which discusses the involuntariness of some so-called voluntary admissions where the person to be hospitalized was already in some form of official custody. That was not the case with Curry, who presented himself for treatment.

8. It is impossible to draw any inference that Curry resisted voluntary treatment

merely from the fact that he was eventually admitted as an involuntary patient. The government indicated at oral argument that it had operated on the assumption that the hospital lacked the authority to admit as a voluntary patient a person mentally ill and likely to injure himself or others—that such persons could only be admitted on an involuntary status. Obviously, our opinion here and in *Lightfoot* indicates this Court's view that the government's assumption is mistaken.