**Elsie MEDYNSKI, Plaintiff,**

v.

**Lawrence S. MARGOLIS, Defendant.**

**Civ. A. No. 1570–73.**

United States District Court,
District of Columbia.

Jan. 8, 1975.

3. 419 U.S. 90, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974).

Harry I. Fulton, Public Defender Service, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Arnold T. Aikens, John R. Dugan, Asst. U. S. Atty., Washington, D. C., for defendant.

Before ROBINSON, Circuit Judge, and SMITH and GREEN, District Judges.

### OPINION

This matter is before the Court on defendant's Motion to Dismiss[1] and plaintiff's opposition thereto. Pursuant to this Court's Order of February 21, 1974, the parties also submitted supplemental memoranda which the Court has considered. Oral argument by counsel was presented on May 8, 1974.

Plaintiff Elsie Medynski alleges, individually and on behalf of all others similarly situated[2], that the procedure for involuntary detention and commitment of mentally ill persons, pursuant to 21 D.C.Code § 901 et seq. (Mentally Ill

---

1. This case came on as a request for a Temporary Restraining Order. Judge Parker, sitting as Motions Judge, heard and denied both the T.R.O. (August 6, 1973), and subsequently, plaintiff's request for convention of a three-judge court (August 23, 1973). Plaintiff filed an appeal for summary reversal which was granted January 15, 1974. The case was remanded to the District Court "for further proceedings". Thereafter, this three-judge court was convened (January 25, 1974).

2. Since plaintiff has never defined or pursued the class action allegations in conformity with Rule 23 of the Federal Rules of Civil Procedure and Rule 1–13 of the Rules of the District Court for the District of Columbia, the Court declines to act on the class action allegations.

Persons Found in Certain Federal Reservations) is violative of due process and equal protection under the Fifth Amendment. Plaintiff Medynski was detained on a federal reservation, the Washington National Airport in Virginia, pursuant to 21 D.C.Code § 901 et seq., *supra*. She was thereafter admitted to Saint Elizabeths Hospital in conformity with the statutory provisions of § 901 et seq. The plaintiff has since been released from the Hospital and has presumably returned to Canada, her place of residence.

■ The first issue before the Court is that of mootness because of plaintiff Medynski's discharge from the Hospital during the pendency of this litigation. The Court concludes that this case is not moot. Inherent in mental health proceedings is the occurrence of short-term detention and/or confinement. In the *Case of John Ballay*, Judge **Tamm** concluded, as we must, that mental health proceedings often fall outside the customary definition of mootness. In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648, 651–653 (1973). The Supreme Court has recently reaffirmed this narrow "capable of repetition, yet evading review" exception to the mootness doctrine. DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (decided April 23, 1974), citing Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Plaintiff Medynski may, in the future, attempt to travel by air in the United States and Canada and be forced to stop at the National Airport. She may again be detained pursuant to § 901, *supra*, and advance the same alleged violations of the Constitution. Plaintiff should not therefore be deprived of an opportunity to be heard simply because she is discharged from the Hospital before her legal remedies have been perfected.

■ An additional, independent reason for deciding that this case is not moot exists—"the collateral consequences of being adjudged mentally ill remain to plague appellant". In re Ballay, *supra*, 482 F.2d at 651–653. A case is moot only if it is shown that there is no possibility that any collateral legal consequence will be imposed on the basis of a challenged conviction. Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Our Court of Appeals has subsequently extended this holding to cases involving contested civil commitment adjudications. Justin v. Jacobs, 145 U.S.App.D.C. 355, 449 F. 2d 1017, 1018–1020 (1970). In the case at bar, plaintiff may suffer the collateral consequences of rehospitalization based on this "past record" of hospitalization. Further, her non-citizen status may be affected in that her right to travel, work or reside in the United States may be restricted by virtue of having been found mentally ill. Plaintiff therefore needs to be advised by a court of law whether her complaint has any on-going validity.

Turning now to the substance of plaintiff's claim [3], the Court concludes that 21 D.C. § 901 et seq. and the application thereof does not present a substantial question of deprivation of the plaintiff's right to due process and equal protection under the Fifth Amendment. Plaintiff bases her complaint on a comparison between the detention provisions of 21 D.C.Code § 901 et seq. (Mentally Ill Persons Found in Certain Federal Reservations) and the detention provisions of 21 D.C.Code § 501 et seq. (Hospitalization of the Mentally Ill). Plaintiff alleges that the two statutes do not contain the same provisions and that therefore those mentally ill persons detained on federal reservations adjacent to the District of Columbia (§ 901) are treated differently from those detained within the District of Columbia (§ 501).

---

3. The plaintiff has twice amended her complaint, once to allege diversity jurisdiction and later to join proper party defendants.

■ The Court does not find that the differences between 21 D.C.Code § 901 and 21 D.C.Code § 501 rise to the level of presenting a substantial constitutional question. A reading of the two statutes reveals some minor procedural differences [4], but none which can be construed by this Court as significant. In fact, this Court is guided by the Supreme Court's warning "that a statute should be interpreted, if fairly possible, in such a way as to free it from not insubstantial constitutional doubts". Lynch v. Overholser, 369 U.S. 705, 711, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962) and cases cited therein. The comparison which plaintiff finds so damaging, in reality reveals that the two statutes are to be read together in a parallel and consistent fashion. For example, 21 D.C. Code § 906 specifically provides that the laws of the District of Columbia—that is, 21 D.C.Code § 501 et seq.—apply to the adjudications of those found mentally ill under § 901 et seq. That this was Congress' intent is clear since § 901 et seq. has been changed twice since the passage of § 501 et seq. Therefore, the two statutes, when read together, do not present any major constitutional inconsistencies.

■ The Court further notes that simply because Congress has legislated two statutes for detaining mentally ill persons, one applicable to the Metropolitan District of Columbia area containing federal reservations and one applicable to the District of Columbia does not present a constitutionally suspect situation. Because the District of Columbia is neither a state nor territory, but a federal enclave, housing the federal government, Congress may legislate a detention statute applicable only within the District. District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed. 2d 613 (1972). The District's statute need not contain the same provisions as those embodied in surrounding jurisdictions to pass constitutional muster.

■ The Court therefore concludes that the claim raised by the plaintiff does not present a substantial constitutional question which would justify further consideration by us.

In accordance with this Opinion, this Court would dismiss this action for failure to state a claim upon which relief can be granted pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Circuit Judge Spottswood W. Robinson, III, would dismiss the action for failure of plaintiff's complaint to state a claim upon which relief can be granted, as more fully set forth in his concurring opinion.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge (concurring):

I am in full agreement with the result the court reaches. My reasons differ significantly, however. Consequently, I set forth my views separately, addressing first the mootness issue [1] and then the constitutional questions.[2]

## I. MOOTNESS

My colleagues hold that the case is not moot because the precipating incident is "capable of repetition, yet evading review,"[3] and because collateral consequences of an adjudication of mental illness will continue to plague Ms. Medynski.[4] I cannot accept either of these claims as a basis for holding, as the court does, that the case, as an action simply on Ms. Medynski's behalf, survived her release from Saint Elizabeths Hospital. If the case could not be

---

4. Defendant's Opposition to Application for convening a Three-Judge Court, pp. 3–5.

1. See Part I, *infra*.

2. See Part II, *infra*.

3. Southern Pac. Terminal Co. v. I.C.C., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, 316 (1911). See also DeFunis v. Ode-gaard, 416 U.S. 312, 318–319, 94 S.Ct. 1704, 1706–1707, 40 L.Ed.2d 164, 169–170 (1974) ; Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712–713, 35 L.Ed.2d 147, 161 (1973).

4. See, *e. g.*, In re Ballay, 157 U.S.App.D.C. 59, 62, 482 F.2d 648, 651 ; Justin v. Jacobs, 145 U.S.App.D.C. 355, 356–358, 449 F.2d 1017, 1018–1020 (1971).

deemed class action—a question the court declines to consider—I would conclude that it is now moot. Since I believe Ms. Medynski's suit does qualify as a class action, I think the controversy before us remains very much alive.

The continuing-controversy exception to the mootness doctrine, which my colleagues undertake to apply, has two elements: a likelihood of repetition of the same or similar events,[5] and a time period too short to enable judicial resolution of the controversy before its current phase passes off the scene.[6] Since Ms. Medynski was admitted to Saint Elizabeths Hospital on August 1, 1973 and released only 30 days later, I have no difficulty in concluding that this litigation meets the latter criterion. To keep the suit viable, however, the circumstances must indicate more than a mere speculative possibility of revival of the conflict; they must establish "that renewal of the controversy 'is a prospect of immediacy and reality.' "[7] The exception is wholly "dependent on a prediction of a recurrence or continuation of what is perceived to be essentially the same legal dispute,"[8] and such a prediction for Ms. Medynski individually is

not possible. The controversy before us can reappear, as one personal to her, only if she returns to the United States from her home in Canada, and happens to again become the subject of a belief of mental illness while on federal property in one of a very few Northern Virginia or Southern Maryland localities.[9] The record discloses nothing to suggest that recurrence of that combination of events at any time in the near future is a realistic probability.

Nor am I persuaded that the collateral-consequences exception to the doctrine of mootness keeps the constitutional issues alive.[10] The court relies on In re Ballay,[11] wherein a mootness claim was rejected because of the damaging byproducts of an adjudication of mental illness.[12] To be sure, Ms. Medynski, like Ballay, was detained for emergency observation and diagnosis,[13] but any relevant similarity between the cases largely ends at that point. The Commission on Mental Health subsequently recommended that Ballay be committed for institutional care,[14] and still later a jury found him mentally ill.[15] In the situation at bar, Ms. Medynski has never been adjudged mentally ill;[16] the only

5. *E. g.*, DeFunis v. Odegaard, *supra* note 3, 416 U.S. at 319, 94 S.Ct. at 1707, 40 L.Ed.2d at 182; Roe v. Wade, *supra* note 3, 410 U.S. at 125, 93 S.Ct. at 35 L.Ed.2d at 161.

6. *E. g.*, DeFunis v. Odegaard, *supra* note 3, 416 U.S. at 319, 94 S.Ct. at 1707, 40 L.Ed.2d at 170; Roe v. Wade, *supra* note 3, 410 U.S. at 125, 93 S.Ct. at 712, 35 L.Ed.2d at 161.

7. Welch v. Simon, D.C.Cir., 498 F.2d 1060, 1062 (1974), quoting Golden v. Zwickler, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113, 118 (1969). See DeFunis v. Odegaard, *supra* note 3, 416 U.S. at 320 n. 5, 94 S.Ct. at 1709–1710 n. 5, 40 L.Ed.2d at 173 n. 5; Carroll v. President & Commissioners of Princess Anne, 393 U.S. 175, 178–179, 89 S. Ct. 347, 350, 21 L.Ed.2d 325, 329–330 (1968); Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 828–899 (1941).

8. Alton & Southern Ry. v. International Ass'n of Machinists & Aerospace Workers, 150 U.S.App.D.C. 36, 43, 463 F.2d 872, 879 (1972). See also Spreckels Sugar Co. v. Wickard, 75 U.S.App.D.C. 44, 45–57, 131 F. 2d 12, 14–15 (1941).

9. See text *infra* at note 47.

10. See, however, note 17, *infra*.

11. *Supra* note 4.

12. *Id.*, at 62–63, 482 F.2d at 651–652.

13. Ballay was committed to Saint Elizabeths Hospital pursuant to the 1964 Hospitalization of the Mentally Ill Act, Pub.L. No. 89–183, 79 Stat. 751, as amended, D.C.Code § 21–501 et seq. (1973). In re Ballay, *supra* note 4, 157 U.S.App.D.C. at 60, 482 F.2d at 649. Ms. Medynski was committed under the Federal Reservation Act, ch. 672, 63 Stat. 759, as amended, D.C.Code § 21–901 et seq. (1973).

14. In re Ballay, *supra* note 4, 157 U.S.App. D.C. at 60, 482 F.2d at 649.

15. *Id.*

16. Commitments under the Federal Reservation Act are made by United States magistrates. D.C.Code §§ 21–902, 21–903 (1973). The magistrate's function is limited to determining whether an apprehended person should be temporarily detained in Saint Elizabeths Hospital for "observation and diagno

operative judgment was a United States Magistrate's determination that she should be held for "observation and diagnosis." [17] I do not gainsay the harmful effects that an adjudication of mental illness may visit;[18] I simply point out that there was no such adjudication here. So I am unable to say, as on divergent facts the court did in *Ballay*, that Ms. Medynski suffers from a "presumption of continued incompetency," and thus a risk of rehospitalization, or that she faces possible loss or impairment of legal rights.[19]

I am convinced, however, that this case is rescued from the doom of mootness by its class action aspect.[20] Of course, relief could not be granted on a class basis without a prior determina-

tion that the suit can be maintained as a class action,[21] and I would agree that Ms. Medynski's complaint, even as amended, leaves a good deal to be desired in that respect.[22] Nevertheless, the applicable precedents indicate plainly enough that the suit does meet all requirements prerequisite to such a determination.[23] Ms. Medynski has yet to tell us just who comprises the class,[24] but obviously it is all those who are—then or in the future—subjected to the procedures erected by the Federal Reservation Act. It is equally obvious that "the class is so numerous that joinder of all members is impracticable;" [25] the parties have stipulated that 74 persons have been committed under the Act during the last four years,[26] and it cannot

sis," D.C.Code § 21–902 (1973). Commitment is authorized if, on evidence meeting specified standards, the person "is believed by the [magistrate] to be a mentally ill person." D.C.Code § 21–902(a), (b) (1973). The magistrate has no power to make an adjudication that the person is in fact mentally ill. The Act makes clear that such an adjudication can follow only if the Secretary of Health, Education and Welfare or a party in interest institutes proceedings in the Superior Court for the District of Columbia to have the detainee adjudged "a mentally ill person." D.C.Code § 21–906(b) (1973).

17. The magistrate, in committing Ms. Medynski, purportedly found that she was "a mentally ill person." That finding was beyond the magistrate's jurisdiction, see note 16, *supra* and the claim that it was void, because jurisdictionally excessive, did not become moot upon Ms. Medynski's release from the hospital. Justin v. Jacobs, *supra* note 4, 145 U.S.App.D.C. at 358, 449 F.2d at 1020. But I seriously doubt that the slip of the magistrate's pen—the finding—saved from mootness the constitutional contentions associated with Ms. Medynski's detention—contentions that because of certain invalidity of the finding on nonconstitutional grounds, would never be reached. See *id.*

18. *Id.* at 357–358, 449 F.2d at 1019–1020.

19. 157 U.S.App.D.C. at 62–63, 482 F.2d at 651–652. See also Justin v. Jacobs, *supra* note 4, 145 U.S.App.D.C. at 357, 449 F.2d at 1019, and cases cited therein.

20. See Fed.R.Civ.P. 23.

21. Fed.R.Civ.P. 23(c)(1). An affirmative order under this rule is a prerequisite to maintenance of a class action. Jackson v. Lynn, 506 F.2d 233 (D.C.Cir., 1974). See

also Dorfmann v. Boozer, 134 U.S.App.D.C. 272, 275 n. 8, 414 F.2d 1168, 1171 n. 8 (1969).

22. When the complaint was amended a second time, to add new defendants, it did not repeat Ms. Medynski's earlier request for class relief. That, in my view, does not prevent adjudication of the constitutional claims for the class. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 225–226 (1962); Nader v. Butz, 154 U.S.App. D.C. 178, 181 n. 23, 474 F.2d 426, 429 n. 23 (1972).

23. See Fed.R.Civ.P. 23(a), (b).

24. This omission causes my colleagues, quite understandably, to decline to consider this litigation on a class action basis. See majority opinion at note 2. For my part, with the class action elements so apparent, the interests of justice are better served by giving it that consideration. See also note 22, *supra.*

25. See Fed.R.Civ.P. 23(a)(1). See also Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 652–653 (4th Cir. 1967), and cases cited *infra* notes 28, 30–31.

26. Affidavit of William T. Wiant. Although most of those committed during this period were either released prior to any determination as to whether they could be held for the full 30-day period or were changed to voluntary hospitalization status prior to the hearing before the magistrate, they were still restrained pursuant to the Act, and undeniably a goodly number of others will meet the same fate in the future. See Barrows v. Margolis, 389 F.Supp. 742 (D.D.C.), decided today.

be doubted that many more will be similarly detained in the years to come.[27] The class need not be so ascertainable that every potential member can be identified when the action commences;[28] it suffices that the criteria by which membership of the class is determinable exist at the onset of litigation.[29] And while the named representative party must then be a member of the class he purports to represent,[30] the fact that it later becomes moot as to the named party does not moot it as to the class,[31] or affect the named party's ability to continue to maintain it for the class.[32]

Other class action prerequisites are likewise met. The constitutionality of the Federal Reservation Act, in the respects challenged by Ms. Medynski, is a "question of law . . . common to the class;"[33] and Ms. Medynski and her claims, typifying those of the class, undoubtedly "will fairly and adequately protect the interests of the class."[34] Nor can it be doubted that "the part-[ies] opposing the class [have] acted . . . on grounds generally applicable to the class, thereby making appropriate final injunctive relief [and] corresponding declaratory relief with respect to the class as a whole."[35] In my view, the case qualifies as a class action and as such falls within the continuing-controversy exception to the mootness rule.[36]

## II. THE CONSTITUTIONAL ISSUES

Ms. Medynski contends principally[37] that the Federal Reservation Act[38] denies the equal protection of the laws secured by the Due Process Clause of the Fifth Amendment.[39] The argument is predicated on variations between the detention and commitment procedures that the Act mandates for people believed to be mentally ill on federal properties in the geographical areas covered[40] and the procedures specified by the 1964 Hospitalization of the Mentally Ill Act[41] for the detention and commitment in the

27. See *id.*

28. See Berman v. Narragansett Racing Ass'n, 414 F.2d 311, 317 (1st Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970) ; Carpenter v. Davis, 424 F.2d 257, 260 (5th Cir. 1970). See also cases cited *infra* notes 30–31.

29. See cases cited *supra* notes 25, 28.

30. *E. g.*, Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–551, 7 L.Ed.2d 512, 513–514 (1962) ; Long v. District of Columbia, 152 U.S.App.D.C. 187, 190, 469 F.2d 927, 930 (1972).

31. Johnson v. New York State Educ. Dep't, 409 U.S. 75, 79 n. 7, 93 S.Ct. 259, 261 n. 7, 34 L.Ed.2d 290, 293 n. 7 (1972) (Marshall, J., concurring) ; Rivera v. Freeman, 469 F.2d 1159, 1163 (9th Cir. 1972) ; Vaughan v. Bower, 313 F.Supp. 37, 40 (D.Ariz.1970) ; Gatling v. Butler, 52 F.R.D. 389, 394–395 (D. Conn.1971). So, additionally to avoiding mootness on account of Ms. Medynski's release from the hospital, class action treatment of this litigation renders unnecessary any inquiry as to whether by reason of her alienage and residence in Canada, she could now assert individually the constitutional protections that were hers while she was in the United States. See, *e. g.*, Johnson v. Eisentrager, 339 U.S. 763, 769–777, 70 S.Ct. 936, 939–940, 94 L.Ed. 1255, 1261–1262 (1950) ; Galvan v.

Press, 347 U.S. 522, 531, 74 S.Ct. 737, 742–743, 98 L Ed. 911, 922 (1954) ; Hines v. Davidowitz, 312 U.S. 52, 69, 61 S.Ct. 399, 405, 85 L.Ed. 581, 588 (1941) ; United States v. Ju Toy, 198 U.S. 253, 261–263, 25 S.Ct. 644, 645–647, 49 L.Ed. 1040, 1043–1044 (1905) ; Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070–1071, 30 L.Ed. 220, 3226 (1886).

32. Rivera v. Freeman, *supra* note 31, 469 F. 2d at 1163 ; Gatling v. Butler, *supra* note 31, 52 F.R.D. at 395.

33. See Fed.R.Civ.P. 23(a)(2).

34. See Fed.R.Civ.P. 23(a)(3). (4).

35. See Fed.R.Civ.P. 23(b)(2).

36. See text *supra* at notes 5–9.

37. I agree with the court that Ms. Medynski's constitutional claims on other than equal protection grounds do not merit discussion.

38. D.C.Code § 21–901 et seq. (1973).

39. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) ; Bolton v. Harris, 130 U.S.App.D.C. 1, 4 n. 3, 395 F.2d 642, 645 n. 3 (1968).

40. See D.C.Code § 21–902 (1973).

41. D.C.Code § 21–501 et seq. (1973).

District of Columbia of persons similarly suspected. My colleagues hold that the two statutes differ in respects too minor to jeopardize the validity of the Reservation Act. I consider one of the differences substantial but, assuming though not deciding the appropriateness of the comparison in which the court and counsel indulge,[42] conclude that the dissimilarities are adequately justified by the governmental interests they respectively serve.

The pivotal principle is that "[e]qual protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary."[43] Concordantly, in Baxstrom v. Herold,[44] the Supreme Court considered a challenge, on equal protection grounds, to the New York practice permitting civil commitment of convicts, upon the expiration of their sentences, without the right to a jury trial, a right that the state accorded everyone else civilly committed.[45] The Court held that "[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made."[46] The task, as I see it, is to ascertain whether there are legitimate governmental interests to be served by the procedural differences between the Reservation and Hospitalization Acts of which Ms. Medynski complains.

The Reservation Act is limited in application to persons apprehended for suspected mental illness on federal properties in specified localities in Northern Virginia and Southern Maryland.[47] Its

---

42. Ms. Medynski rests her constitutional attack exclusively upon a comparison of the texts of the Hospitalization and Reservation Acts, and defendants undertake their defense through the same technique. It is not wholly clear to me that this comparison is the one to be made for equal protection purposes. Since Ms. Medynski's entitlement is substantially the same treatment that the Federal Government accords others similarly situated, see text *supra* at notes 43–46, it is conceivable that the inquiry might more properly relate to possible differences between procedures under the Reservation Act and procedures for federal handling of similarly situated persons on federal properties throughout the country. If there is a nationwide federal practice addressing that problem, a variant practice in the District of Columbia metropolitan area might pose an equal protection question. See United States v. Thompson, 147 U.S.App.D.C. 1, 4–9, 452 F.2d 1333, 1336–1341 (1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L. Ed.2d 467 (1972). On the other hand, it may be that the problem, in magnitude or otherwise, is essentially local, and that the legislation complained of represents simply a "tailoring [of] local statutes to meet local needs." *Id.* at 6, 452 F.2d at 1338.

In any event, the equal protection issues cannot be resolved upon such considerations. The relevance of the parties' comparison was the subject of questions addressed to counsel at the hearing on the motion to dis-

miss, but neither side has seen fit to explore the matter further. Consequently, the record is devoid of any acceptable indication as to what the federal practice elsewhere is, and of any basis for making any comparison other than the one the parties have indulged in. Courts are not at liberty to consider constitutional claims on inadequate factual foundations. Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 462–463, 65 S.Ct. 1384, 1390, 89 L.Ed. 1725, 1734–1736 (1945); Concordia Fire Ins. Co. v. Illinois, 292 U.S. 535, 547, 54 S.Ct. 830, 834–835, 78 L.Ed. 1411, 1418–1419 (1934); O'Gorman & Young, Inc. v. Hartford Fire Ins. Co., 282 U.S. 251, 257–258, 51 S.Ct. 130, 131–132, 75 L.Ed. 324, 327–328 (1931); Fort Smith Light & Traction Co. v. Board of Improvement, 274 U.S. 387, 391–392, 47 S.Ct. 595, 597, 71 L.Ed. 1112, 1115 (1927).

43. Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660, 665–666 (1954).

44. 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

45. *Id.* at 115, 86 S.Ct. at 764–765, 15 L.Ed. 2d at 625–626.

46. *Id.* at 111, 86 S.Ct. at 762–763, 15 L.Ed.2d at 623–624. See also Bolton v. Harris, *supra* note 39, 130 U.S.App.D.C. at 7–8, 395 F. 2d at 651–652.

47. D.C.Code § 21–902(a) (1973).

passage was prompted by "[t]he rapid increase in Federal offices and Federal personnel located in nearby Virginia and Maryland," [48] and concomitantly the increased "difficulties in dealing with cases of mental diseases occurring in those areas." [49] The Act was neither designed nor intended to require or permit detention of mentally ill people for long periods of time,[50] nor was it drafted to provide comprehensive procedures for adjudication of mental illness.[51] It is, rather, an interim measure enabling temporary detention of those who on federal property are believed to be in need of medical care for mental illness, with a view to speedy return of the detainee "to the State of his residence or to his relatives, if practicable." [52]

The Hospitalization Act, on the other hand, is a comprehensive statute dealing with all aspects of detention and treatment of mentally ill people in the District of Columbia.[53] In recognition of that, the Reservation Act provides that the Hospitalization Act procedures shall govern proceedings for commitment beyond the maximum 30-day detention authorized by the Reservation Act.[54] There is, however, by my appraisal one substantial difference between the two statutes, but that difference, I think, is sufficiently related to their variant purposes to sustain the challenged legislation in the face of an equal protection claim.

The periods of initial detention respectively provided by the statutes, prior to accrual of any right to a judicial hearing leading to a determination on mental illness, are essentially the same.[55] Under the Hospitalization Act, after expiration of a 48-hour period following admission to a hospital, a detainee can be held for an additional seven days by court order obtained ex parte, but must be released thereafter unless judicial proceedings looking forward to an adjudication of mental illness are begun.[56] Under the Reservation Act, however, the detainee, if committed by a magistrate, can be held for 30 days from the date of the magistrate's order before the Government is required to either release

---

48. S.Rep. No. 302, 81st Cong., 1st Sess. 3 (1949).

49. *Id.*

50. See 95 Cong.Rec. 5826 (1949). See also note 51, *infra.* The Act operates only on federal properties in two states that also have general statutes establishing procedures for adjudication of mental illness. See Md. Code, art. 59, §§ 12–21 (1972) ; Va.Code §§ 37.1–67, 37.1–67.1 (Supp.1974).

51. The Act was drafted by the Department of Justice. In its transmittal letter the Department stated:

If the Superintendent finds him to be of unsound mind, he would report his findings to the Federal Security Administrator, with a view to returning the patient to the State of his residence, or to relatives if practicable. Otherwise proceedings for his adjudication as an incompetent person would be instituted in the United States District Court for the District of Columbia.

S.Rep. No. 302, 81st Cong., 1st Sess. 3 (1949).

52. D.C.Code § 21–906(a) (1973).

53. The Hospitalization Act was drafted after a "comprehensive 3-year study by the Senate Judiciary Subcommittee on Constitutional Rights." H.R.Rep. No. 1833, 88th Cong., 2d Sess. 2 (1964). The Subcommittee expressed its hope that, although the Act applied only in the District of Columbia, it would "serve as a model for revision of state hospitalization laws." S.Rep. No. 925, 88th Cong., 2d Sess. 10 (1964).

54. D.C.Code § 21–906(b) (1973).

55. The Hospitalization Act provides that a detainee may be held for emergency observation and diagnosis for 48 hours within which the administrator of the detaining hospital may petition the court for continued hospitalization for a period not exceeding seven days from the date of this court's order. D. C.Code § 21–523 (1973). The court has 24 hours within which to act on the petition, D.C.Code § 21–524 (1973), and so a 72-hour period of permissible initial detention may result. The Reservation Act requires an immediate hearing before a magistrate if possible, otherwise, a hearing as promptly as practicable and in any event within 72 hours. D.C.Code § 21–903 (1973).

56. See note 55, *supra.*

him or to institute regular commitment proceedings.[57] A Hospitalization Act detainee can be held pending the outcome of his hearing,[58] but is accorded the right to an initial hearing 24 hours sooner than a Reservation Act detainee.[59] The crucial question for me is whether these procedural dissimilarities are sufficiently related to divergent legislative objectives of the two statutes to survive assault on equal protection grounds. My answer to that question is in the affirmative.

The evident goal of the Federal Reservation Act is not institutionalization for treatment, but detention, if necessary, only until the detainee can be returned to his residence or relatives or, failing that, proceedings for a full-fledged commitment are commenced. Detainees under the Reservation Act very well may be nonresidents of the District of Columbia Metropolitan area, and may be from any part of the nation or the world;[60] indeed, Ms. Medynski is a citizen and resident of Canada. Obviously, the task of ascertaining a detainee's residence or locating relatives cannot invariably be accomplished within a few days. This aim contrasts with the Hospitalization Act's goal of institutionalized care and treatment and the more localized populace in the District of Columbia. The Reservation Act's authorization of a maximum 30-day detention period does not necessitate the holding of detainees for the full period, and the record informs us that the vast majority are not held that long.[61] I read the statute as requiring return of detainees to their homes or families as soon as practicable,[62] which the authorities now endeavor to do,[63] and consequently I cannot say that the Reservation Act, either facially or as administered, falls short of the demands of equal protection. Nor can I conclude that the maximum 30-day detention period provided for in the Reservation Act is longer than effectuation of its basic purpose reasonably requires.

Ms. Medynski also contends that there is a vitiating difference between the standards governing initial detentions pursuant to the two statutes. Under the Hospitalization Act, authorities can hold any person who they have reason to believe is mentally ill and "likely to injure himself or others if he is not immediately detained."[64] Under the Reservation Act, initial detention is conditioned on a belief that the detainee is mentally ill;[65] and as soon as practicable the detainee must be given a hearing before a magistrate,[66] whereupon the magistrate can order the detainee held for up to 30 days if there is evidence that he is mentally ill and should be in custody "for the treatment of mental or nervous disorders for his own safety and welfare and for the preservation of the peace

---

57. D.C.Code § 21–902(b) (1973). See also note 55, *supra.*

58. D.C.Code § 21–528 (1973).

59. See note 55, *supra.*

60. Two federal properties within geographical areas covered by the Reservation Act are Washington National Airport and Dulles International Airport, through which thousands of travelers pass daily.

61. Of 74 commitments to Saint Elizabeths Hospital under the Federal Reservation Act in the past four years, only eight have been held for the full 30 days. Affidavit of William T. Wiant.

62. See D.C.Code §§ 21–902(c), 21–906(a), 21–907 to 21–909. Ms. Medynski points out that a similar provision in the Hospitalization Act has been held unconstitutional. Jem-

ison v. Robinson, Civil No. 927–70 (D.D.C., Oct.1970). The court there found that the Act distinguished between voluntary and involuntary patients, and transferred to the state of residency only involuntary mental patients who failed to meet a one-year residence requirement, and that a compelling governmental interest warranting the distinction had not been shown. The Reservation Act, however, makes no distinction between voluntary and involuntary patients in this regard. See D.C.Code § 21–906(b) (1973).

63. See note 61, *supra.*

64. D.C.Code § 21–521 (1973).

65. D.C.Code § 21–903(a) (1973).

66. D.C.Code § 21–903(a), (b), (1973).

and good order." [67] Like my colleagues, I cannot agree that these differences are of constitutional magnitude.[68]

For these reasons, I join my colleagues in holding that Ms. Medynski's action is not moot, and in sustaining the Federal Reservation Act against her equal protection attack.

---

67. D.C.Code § 21–902(b) (1973).

68. There is no indication that federal authorities apply the Reservation Act in such manner that the difference in wording becomes significant, or that Reservation Act detainees could not as well be apprehended under the Hospitalization Act standard.