Moses N. BENSION, Petitioner,

v.

Dr. Charles MEREDITH, Respondent.

Civ. A. No. 78–310.

United States District Court, District of Columbia.

March 10, 1978.
Opinion On the Merits July 14, 1978.

Kenneth J. Burchfiel, Washington, D. C., for petitioner.

Robert Roper, Asst. U. S. Atty., Washington, D. C., for respondent.

## MEMORANDUM AND ORDER

GESELL, District Judge.

While detained involuntarily at St. Elizabeth's Hospital, Moses Bension, of unknown address and citizenship, petitioned this Court for a writ of habeas corpus on the grounds that the so-called Federal Reserva-

tion Act, D.C.Code §§ 21–901 to –909 (1973), under which he was originally detained, is unconstitutionally vague and overbroad and that its application had denied him the equal protection of the laws. The Act authorizes in certain instances the temporary commitment of mentally ill persons found on federal reservations within named counties of Maryland and Virginia. The Court allowed filing of the writ in forma pauperis[1] and issued an order to show cause, which respondent answered, claiming mootness and a lack of jurisdiction in this Court. A hearing was held.

## I.

The jurisdictional argument stems from the peculiar although not irregular procedures to which the petitioner was subject subsequent to his detention. On January 19, 1978, after causing a commotion at Dulles International Airport,[2] petitioner was brought by federal agents to St. Elizabeth's Hospital pursuant to *id.* § 21–903(a). On the following day, after a hearing at which he was represented by counsel and at which two psychiatrists testified, petitioner was committed under *id.* § 21–902 by a United States Magistrate for the District of Columbia to St. Elizabeth's for "observation and diagnosis" over a period not to exceed 30 days. Twenty-four days later, on February 13, 1978, a representative of the respondent, acting pursuant to the local District of Columbia commitment laws, filed with the District of Columbia Commission on Mental Health a petition for indefinite judicial hospitalization of Mr. Bension.[3] On the same day an associate judge of the Superior Court of the District of Columbia considered the petition and authorized continued detention under *id.* § 21–523 pending final disposition of the mental health proceedings.[4] The instant petition for a writ of habeas corpus was filed 11 days later.

The hybrid nature of petitioner's detention within the same institution under successive federal and state orders exacerbates the jurisdictional difficulties already inherent in habeas cases within the District of Columbia. Respondent claims first that the Court lacks habeas jurisdiction because at the time of filing petitioner was no longer in custody pursuant to the statute he attacks. The petition challenges the Federal Reservation Act, but was filed five days after the federal magistrate's order under that statute had expired. At that time petitioner was being held by an order of the Superior Court of the District of Columbia entered pursuant to the District of Columbia commitment laws. *Id.* § 21–524. Thus, says respondent, petitioner cannot ask to be released from the operation of a statute that no longer binds him.

In the criminal postconviction context the law is clear that one may challenge any earlier conviction that may in some way operate to enhance punishment on a subsequent sentence being served at the time of challenge. *See Cappetta v. Wainwright,* 406 F.2d 1238, 1239 (5th Cir.), *cert.*

---

1. The petition was filed by counsel appointed for petitioner during prior proceedings in the Superior Court of the District of Columbia. Representation in this Court was subsequently authorized, and petitioner's case has been most competently advanced.

2. A physician at St. Elizabeth's reported that while at Dulles petitioner stated he was "going to overthrow the U.S. Government" and that the Government owed him $485 billion. He then apparently called the Russian Embassy to arrange a flight to China.

3. D.C.Code § 21–906(b) (1973), which is part of the Federal Reservation Act, provides that proceedings for the "adjudication" of a person temporarily detained under that Act "may be instituted in the Superior Court of the District of Columbia . . . . The laws of the District of Columbia shall apply to the proceedings." (Prior to 1973 jurisdiction had been in the United States District Court.) Presumably "adjudication" refers to a judicial order for indefinite commitment. District of Columbia law, *id.* § 21–541(a), allows such proceedings to be initiated, as they were in this case, by petition to the Mental Health Commission.

4. *See id.* § 21–523. Petitioner alleges that respondent's petition contained material misrepresentations of fact and was not in the form required by *id.* § 21–588. Since petitioner is free, and given the disposition reached herein, the Court need not consider these claims.

*denied,* 396 U.S. 846, 90 S.Ct. 55, 24 L.Ed.2d 96 (1969); *United States ex rel. Durocher v. LaVallee,* 330 F.2d 303, 305–06 (2d Cir.), *cert. denied,* 377 U.S. 998, 84 S.Ct. 1921, 12 L.Ed.2d 1048 (1964). In the absence of any similar case involving civil commitment, the Court sees no reason to deny application of this rule to the case at bar. Petitioner's commitment under the Federal Reservation Act did more than simply enhance his detention period under the Superior Court order: had petitioner not been brought to St. Elizabeth's and thus into the District of Columbia in the first place, the Superior Court would never have had the power to authorize custody at all.

Respondent claims nonetheless, citing both D.C.Code § 23–110(g) (1973) and the exhaustion doctrine, that even if petitioner can challenge his prior commitment, challenge must be made in the Superior Court. The Court does not agree. Section 23–110(g), patterned after 28 U.S.C. § 2255 (1970), relates only to an application for a writ on behalf of a "prisoner in custody under sentence of the Superior Court," and thus has no application in the civil commitment context.[5] *Cf. O'Beirne v. Overholser,* 109 U.S.App.D.C. 279, 282, 287 F.2d 133, 136 (1960); *Hill v. United States,* 206 F.2d 204, 206 (6th Cir.), *cert. denied,* 346 U.S. 859, 74 S.Ct. 75, 98 L.Ed. 372 (1953).

The exhaustion doctrine, as codified in the federal habeas corpus statute, removes federal jurisdiction prior to exhaustion of state remedies only from an application "in behalf of a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(b) (1970). Petitioner, however, was never held in custody under a Superior Court judgment, but only under an order of temporary detention pending an adjudication of mental illness. Yet, even if an ex-haustion requirement applies to prejudgment petitions, it is inapplicable here. The doctrine exists to assure state court systems the right to examine federal constitutional challenges to state laws before resort is allowed to the federal forum. The federal reservation statute, although it appears in the District of Columbia Code, lacks any other attribute of a state statute within the meaning of the exhaustion doctrine. It applies to individuals found not within the territorial boundaries of the District of Columbia, but within federal reservations in Maryland and Virginia. Commitment is contingent upon an order of a federal magistrate. As a practical matter the statute is a federal one. The usual considerations of federalism that support the exhaustion doctrine find no application here, and there is no reason for deference to the local judiciary. In fact, counsel for respondent himself suggests that petitioner's prior counsel should have raised his constitutional claims before the federal magistrate at the time of his original commitment.

Furthermore, the District of Columbia habeas corpus statute itself mandates that the petition be filed in this Court. "Petitions for writs directed to Federal officers and employees," the statute reads, "shall be filed in the United States District Court for the District of Columbia." D.C.Code § 16–1901(b) (1973). Respondent, while acting pursuant to the magistrate's order, served as a federal officer. *See McCall v. Swain,* 166 U.S.App.D.C. 214, 510 F.2d 167 (1975). Habeas corpus is a proper means for testing the constitutionality of detention under the civil commitment laws, *see, e. g., Lake v. Cameron,* 124 U.S.App.D.C. 264, 364 F.2d 657 (1966), and this Court is the only forum able to hear petitioner's habeas claim. Respondent's jurisdictional objections are denied.

---

**5.** Subsection (g) provides:

An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section shall not be entertained by the Superior Court or by any Federal or State court if it appears that the applicant has failed to make a motion for relief under this section or that the Superior Court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

## II.

Four days after this petition was filed, the Mental Health Commission of the District of Columbia held a hearing at which petitioner and his counsel were present. The Commission unanimously reported to the Superior Court that it found petitioner to be "mentally ill but not likely to injure himself or others if allowed to remain at liberty." On the same day, based on this finding, the Superior Court ordered the petition for judicial hospitalization dismissed and the petitioner herein released.

■ Petitioner's release does not moot his case. So long as his record reflects the findings both of the magistrate and the Mental Health Commission that he is "mentally ill," it cannot be said that "there is no possibility that any collateral legal consequence will be imposed" as a result of his detention. *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1968). Indeed the United States Court of Appeals for the District of Columbia Circuit has explicitly outlined many such possible collateral consequences, including restrictions on voting rights and jury service, the ability to obtain licenses, and most significantly use of the determination in subsequent proceedings for civil commitment. *See In re Ballay,* 157 U.S.App.D.C. 59, 62–63, 482 F.2d 648, 651–52 (1973); *cf. Justin v. Jacobs,* 145 U.S.App.D.C. 355, 358–359, 449 F.2d 1017, 1018–20 (1971). Respondent seeks to minimize the impact of the findings of mental illness on the grounds, first, that no formal judgment to that effect was ordered, and, second, that petitioner already has a long record of mental illness and civil commitment. As to the first, the fine distinction between a judicial "finding" and a judgment was apparently not found persuasive in either of the closely analogous cases of *In re Curry,* 152 U.S.App.D.C. 220, 222, 470 F.2d 368, 370–71 (1972), and *Medynski v. Margolis,* 389 F.Supp. 743, 745 (D.D.C.1975) (three-judge court), neither of which involved a judgment in the formal sense ascribed to the term by respondent. And as to the second, the Supreme Court has explicitly held that neither the number

nor the nature of one's prior commitments can properly be used to suggest that untoward collateral consequences will not result from the most recent adverse determination. *Sibron v. New York,* 392 U.S. at 56–57, 88 S.Ct. 1889.

Beyond the collateral consequences that prevent the case from being considered moot, the representations of petitioner's counsel indicate that a reoccurrence of petitioner's detention under the Federal Reservation Act is not unlikely. The short commitment period authorized by the Act makes review of the Act's constitutionality difficult. Yet, as the Supreme Court advised in *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), consideration of an issue of such public importance "ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review." For these reasons as well, the case is not moot.

## III.

■ The petition raises serious constitutional questions which the Court is prepared to address but for one shortcoming: the apparent lack of a true complaining party. Since the outset the Court has received no indication of any consent by petitioner to his representation in this matter. Counsel was appointed by the Court, and because of counsel's representations of exigency the petition was allowed to be filed in forma pauperis without a supporting affidavit. Now free, petitioner's whereabouts and desires are utterly unknown to his lawyer. He may have no wish to pursue his petition, and indeed he may not even realize that it is still pending, if he ever knew that it had been filed. Contrary to the requirement of 28 U.S.C. § 2242 (1970), the petition is not verified, and although the Court does not view this defect as warranting dismissal, *compare Morris v. United States,* 399 F.Supp. 720, 723 (D.Va.1975), *with Dorsey v. Gill,* 80 U.S.App.D.C. 9, 21, 148 F.2d 857, 869, *cert. denied,* 325 U.S. 890, 65 S.Ct. 1580, 89 L.Ed. 2003 (1945), *overruled on other grounds, Overholser v. Boddie,* 87 U.S.App.

D.C. 186, 184 F.2d 240 (1950) (en banc), it does reinforce the Court's doubt that petitioner wishes to proceed.

An Article III court is bound to act only when satisfied that it confronts a true case or controversy. As a purely intellectual matter the issues presented are sufficiently adverse to be judicially resolved, but absent a true petitioner, cognizant of and willing to pursue the claims, the dispute retains an abstract, hypothetical cast, which is anethema to judicial review. *See Sibron v. New York,* 392 U.S. at 57, 88 S.Ct. 1889, 20 L.Ed.2d 917; *see also United States v. Johnson,* 319 U.S. 302, 304–05, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943); *Chicago & Grand Trunk Railway v. Wellman,* 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892).

Even were the suit as presently postured not constitutionally deficient, the Court sees no reason to allow the proceedings to continue in forma pauperis absent the affidavit required by 28 U.S.C. § 1915(a) (1970). Therefore, petitioner shall have until March 23, 1978, to file an affidavit reciting his knowledge of the case, his willingness to proceed, and his inability to pay the costs of the litigation or to give security therefore.[6] If no submission is forthcoming, the case will be dismissed.

SO ORDERED.

### OPINION ON THE MERITS

On January 19, 1978, federal agents acting pursuant to the Federal Reservation Act, D.C.Code § 21–903(a) (1973), a temporary civil commitment statute, seized petitioner at Dulles International Airport and brought him, restrained, to Saint Elizabeth's Hospital. The following day, after a hearing at which petitioner was represented by counsel, a United States Magistrate for the District of Columbia committed petitioner to Saint Elizabeth's for 30 days of "observation and diagnosis." While in custody petitioner filed for a writ of habeas

corpus, in which he argued on several grounds the unconstitutionality of the Act. The Court issued an Order to Show Cause, which respondent moved to dismiss, claiming mootness and a lack of subject matter jurisdiction. The Court rejected these defenses in an earlier opinion. *Bension v. Meredith,* Civ. Action No. 78–0310 (D.D.C. Mar. 10, 1978). The parties have now filed full briefs on the merits of the case, and arguments have been heard. Addressing only one of plaintiff's arguments, the Court finds the Act unconstitutional as applied.

### I.

The Federal Reservation Act authorizes in certain instances the temporary commitment of mentally ill persons found on federal reservations within counties of Maryland and Virginia in or neighboring the District of Columbia metropolitan area. The Act, which provides for a maximum of 30 days' detention, is essentially an interim measure. It contemplates that following detention the individual will either be returned "to the State of his residence or to his relatives, if practicable" or committed pursuant to the regular District of Columbia commitment laws, D.C.Code §§ 21–501 to –592 (1973) (hereinafter referred to as the "Ervin Act"). *Id.* § 21–906. The Reservation Act provides for a prompt hearing before a magistrate following initial detention and establishes the following standard and procedure for commitment:

> (a) A United States commissioner . . . may commit to Saint Elizabeths Hospital, for observation and diagnosis, a person found in a [designated federal reservation] who is alleged, and believed by the commissioner, to be a mentally ill person.

> (b) A commitment provided for by . . . this section shall be for not more than 30 days and may be made only after a hearing before the commissioner upon:

---

6. This last requirement can be avoided by the filing of an affidavit of competent authority that petitioner's delusions prevent such an ad-

mission and that he does not have sufficient resources.

(1) the testimony under oath of at least two witnesses as to their belief that the person is a mentally ill person; and

(2) the testimony under oath or affidavit of two physicians, at least one of whom is skilled in the treatment and diagnosis of nervous and mental disorders, that they have examined the alleged mentally ill person and believe him to be a mentally ill person and not fit to remain at liberty and go unrestrained, and that he should be in custody in a hospital for the treatment of mental or nervous disorders for his own safety and welfare and for the preservation of the peace and good order.

*Id.* § 21–902. It is this language which is the subject of petitioner's constitutional attack.

## II.

■ Because of the "massive curtailment of liberty" occasioned by a civil commitment of any length, *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), certain constitutional rights attach to the civil commitment process. One such right is the Fifth Amendment right not to be so detained simply because one is "mentally ill." As the Supreme Court has stated in *O'Connor v. Donaldson,* 422 U.S. 563, 575–76, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975):

A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

.     .     .     .     .

In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.

Thus commitment is justified only where an individual is both mentally ill and dangerous to himself or others. Although *O'Connor* dealt with a case of indeterminate commitment, its rule has not been so limited in application, as respondent recognizes, and the Court declines to deny petitioner the full protection of the enunciated standard. *See, e. g., Suzuki v. Alba,* 438 F.Supp. 1106, 1109 (D.Hawaii 1977); *Stamus v. Leonhardt,* 414 F.Supp. 439, 450 (S.D.Iowa 1976); *Doremus v. Farrell,* 407 F.Supp. 509, 514–15 (D.Neb.1975) (three-judge court).[1]

■ An important collateral procedural right combines with the substantive right enunciated in *O'Connor.* As in criminal and juvenile cases, *see Brown v. Fauntleroy,* 143 U.S.App.D.C. 116, 117, 442 F.2d 838, 839 (1971), a person detained under a civil commitment statute must be given a hearing "within a reasonable time" to ensure that probable cause exists to believe that confinement is constitutionally and statutorily warranted. *See In re Barnard,* 147 U.S.App.D.C. 302, 305, 455 F.2d 1370, 1374 (1971); *Bell v. Wayne County General Hospital,* 384 F.Supp. 1085, 1097–98 (E.D.

---

1. The *O'Connor* opinion itself also dealt only with the case of purely custodial, as opposed to remedial, confinement, and the Court thus found "no occasion in this case to decide whether the provision of treatment, standing alone, can ever constitutionally justify involuntary confinement." 422 U.S. at 574 n. 10, 95 S.Ct. 2486, 2493. Other courts have not so limited application of the dangerousness requirement. *See, e. g., Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972) (three-judge court), *vacated on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *reinstated and enforced,* 379 F.Supp. 1376 (E.D.Wis.), *va-* cated on other grounds, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *reinstated,* 413 F.Supp. 1318 (E.D.Wis.1976). This case, however, deals with an interim detention statute of which treatment is obviously not an aim. Moreover, the psychiatrists who testified at petitioner's hearing admitted that petitioner had firmly refused "treatment" in the form of depressant drugs (concededly not responsive to his diagnosed condition), and that only "maybe" could they "help him out" in the future. Under these circumstances the *O'Connor* standard applies.

Mich.1974) (three-judge court); *Lessard v. Schmidt,* 349 F.Supp. 1078, 1093–94 (E.D. Wis.1972) (three-judge court), *vacated on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *reinstated and enforced,* 379 F.Supp. 1376 (E.D.Wis.), *vacated on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *reinstated,* 413 F.Supp. 1318 (E.D.Wis.1976).[2] Also, as in criminal and juvenile proceedings, the Government has the burden of proof, and the probable cause finding must be made by an impartial, preferably a judicial, officer. *See Doremus v. Farrell,* 407 F.Supp. 516; *Lynch v. Baxley,* 386 F.Supp. 378, 388 (M.D. Ala.1974) (three-judge court). Together, the dangerousness and probable cause requisites combine to require the judge—or as in this case the magistrate—to enter a finding that there exists probable cause "to believe the patient is mentally ill and, as a result thereof, is likely to injure himself or others." *In re Barnard,* 147 U.S.App.D.C. at 306, 455 F.2d at 1374. If this finding cannot be made, the subject must be released.[3]

## III.

This requirement and the rights underlying it appear to be jeopardized by the statute in question. Although it unquestionably provides for a prompt hearing, the statute does not require, in so many words, that the magistrate find the detainee dangerous to himself or others. A strict reading of its terms requires only that (1) two competent physicians testify that upon examination

they "believe" the detainee should remain in custody "for his own safety and welfare and for the preservation of the peace and good order," and (2) the magistrate certify his belief that the detainee is "mentally ill."

Respondent argues that under a more liberal reading the Act may be interpreted in a manner consistent with the constitutional standard. In support he cites *Medynski v. Margolis,* 389 F.Supp. 743 (D.D.C. 1975), in which a three-judge court sitting in the District of Columbia held that the provisions of the Federal Reservation Act "are to be read together in a parallel and consistent fashion" with the Ervin Act. The latter Act, as construed in *Barnard,* provides that a person may not be committed even on an emergency basis if he is not, within a short time after detention, found by a court to be "mentally ill and because of the illness . . . likely to injure himself or others if he is not immediately detained." D.C.Code § 21–521 (1973); *cf. id.* § 21–541(a).

The Court readily agrees that no talismanic words are required to comply with the constitutional commitment standard, and that under a liberal construction the Act could be interpreted in a constitutionally acceptable manner. *See Lynch v. Overholser,* 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *see generally Jackson v. Indiana,* 406 U.S. 715, 728, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). Before determining whether such an imposed construction is required or even permissible, however, it is

2. The courts that have considered the matter have agreed unanimously that there is no right to a hearing prior to initial detention. Just how prompt a post-detention hearing is required is the subject of some dispute. *Compare, e. g., Lessard v. Schmidt,* 349 F.Supp. at 1091 (within 48 hours of detention) *and Bell v. Wayne County General Hospital,* 384 F.Supp. at 1098 (within five days) *with Coll v. Hyland,* 411 F.Supp. 905, 909–10 (D.N.J.1976) (within 20 days) *and Logan v. Arafeh,* 346 F.Supp. 1246, 1268–69 (D.Conn.1972), *aff'd mem. sub nom. Briggs v. Arafeh,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973) (within 45 days).

3. Counsel for the Government apparently recognized the nature of the proceeding, although perhaps not the correct standard:

> Your Honor, in this case, as Your Honor knows, this is a probable cause hearing, and the standard, according to the statute, is for the Court to determine, on the basis of all the evidence, the lay testimony as well as the expert testimony, whether Mr. Bension must be involuntarily hospitalized for a period not to exceed 30 days, for the reason that he should be hospitalized for his own safety and welfare, and in the words of the statute, for the preservation of the peace and good order.
>
> There is no requirement that the Court find specifically that he poses a physical danger to other individuals. It's couched in terms of peace and good order.

necessary to examine how the statute has been applied in this case. *See Reynolds v. Sheldon,* 404 F.Supp. 1004, 1010 (N.D.Tex. 1975). The *Medynski* Court had before it "no indication that federal authorities apply the Reservation Act in such a manner that the difference in wording [between the Reservation Act and the Ervin Act] becomes significant." 389 F.Supp. at 753 n. 68 (Robinson, J., concurring). The facts of this case, however, indicate precisely how the statute was interpreted in this particular instance.

Both at the hearing and in the magistrate's order, the letter of the law was followed. Five witnesses testified. Two security officers of the Federal Aviation Authority at Dulles testified as to the events and circumstances leading up to petitioner's detention. Two psychiatrists opined as to his condition on the basis of a joint one-hour interview and acknowledged that petitioner had refused voluntary commitment and any drug treatment. Finally, petitioner spoke on his own behalf. At the conclusion of the hearing the magistrate ordered petitioner's 30–day commitment upon the following findings:

> 1. Two lay witnesses Frank Dunn and Marvin Romine, testified under oath as to their belief that the patient is a mentally ill person.
>
> 2. Two psychiatrists from St. Elizabeths Hospital, Dr. Leon Konchegul and Dr. Eliseo Verde, both experts in their field testified under oath. They expressed the opinion that the patient is a mentally ill person and unfit to remain at liberty and go unrestrained, and that he should be in custody in a hospital for the treatment of mental and physical disorders for his own safety and welfare and for the preservation of the peace and good order.
>
> On the basis of all the evidence at the hearing, the Magistrate finds that the patient is a mentally ill person . . . .

As can be seen, it was the doctors who "found" that the literal statutory standard was met. The magistrate found only that petitioner was "a mentally ill person."

■ This is clearly not the requisite probable cause finding. To be sure, the requirement of probable cause dictates that the magistrate consider medical evidence and opinion. But ultimately a legal standard must be applied to these medical facts. And as the United States Court of Appeals for the District of Columbia Circuit has reiterated again and again in analogous situations, this is a task for a judicial officer. *Cf., e. g., Cross v. Harris,* 135 U.S.App.D.C. 259, 264–265, 418 F.2d 1095, 1100–01 (1969) (finding of dangerousness under District of Columbia Sexual Psychopath Act); *Washington v. United States,* 129 U.S.App.D.C. 29, 36–42, 390 F.2d 444, 451–57 (1967) (insanity defense). The magistrate, however, interpreted the Federal Reservation Act as requiring him only to certify a belief that petitioner was mentally ill, and not, further, that "as a result thereof," probable cause existed to believe that he was "likely to injure himself or others if not detained." [4]

## IV.

In the context of this lawsuit the Court might be prepared to hold the lack of an adequate probable cause finding as harmless error, had the hearing record disclosed sufficient evidence to conclude that the requisite finding could constitutionally have been made. But the record before the magistrate was woefully deficient. The only testimony possibly bearing on the issue of dangerousness was as follows:

Sergeant Frank Dunn, the first lay witness, testified that petitioner was found during midday at Dulles claiming that the Government owed him some *$458 billion.*[5] Petitioner apparently made calls to the Rus-

---

**4.** The Court therefore has no occasion to consider respondent's contention that had the magistrate made a reasoned finding that petitioner should be detained "for his own safety and welfare and for the preservation of the peace and good order" (the standard to which the statute requires two psychiatrists to attest), the constitutional standard would have been met. The magistrate made no such finding.

**5.** The exact figure is in some dispute.

sian Embassy, the Secret Service, and the Department of Treasury so informing them and requesting aid for a chartered flight to China. He was then escorted to the police station. Sergeant Dunn called the Secret Service, who informed him that they were familiar with petitioner, whom they considered a "nuisance," and that they had no desire to interview him or detain him. Asked whether petitioner had ever made any threatening remarks, Sergeant Dunn answered that the "only thing he stated was that a lot of people would get hurt if he did not get his money. I asked him how would they get hurt, and I could get no answer from him." The sergeant indicated that petitioner was peaceable and that he made no direct threats to anyone.

Detective Romine, the second lay witness, recounted petitioner's claim of responsibility for the recent air crash in the Canary Islands, an oil well fire, and a power outage the day before in the Dulles area. He testified that petitioner had said that he would not leave the airport until paid. Beyond this the detective's testimony paralleled that of Sergeant Dunn. In the opinion of both police officers the petitioner was mentally ill, and it was presumably for that reason that he was taken to Saint Elizabeth's Hospital.

Each of the two psychiatrists related petitioner's opposition to detention and drug treatment, and both stated that he behaved as "a gentleman all the way." They diagnosed his condition as schizophrenic, chronic undifferentiated type. Both disavowed any belief based on observation that petitioner would be dangerous to others if not detained. They also denied that petitioner would be likely to injure himself. They felt instead that his detention should continue because he had no money and because his condition might lead people to take advantage of him.

Petitioner took the stand on his own behalf. The transcript portrays a competent, composed, intelligent, and very articulate man suffering from certain delusions. Petitioner recounted a detailed personal history. He denied that he had no place to go and recited the existence and location of his wife, sister, two brothers, and two grown children (most of which was subsequently confirmed).

This evidence could in no way support the requisite probable cause finding. Therefore petitioner's continued confinement was unwarranted.

A question remains, however, as to the continued validity of the statute. Obviously since the magistrate acted upon the letter of the law, the statute as literally interpreted cannot be upheld. It must either be struck down or construed so as to preserve its constitutionality. The balance weighs heavily in favor of the latter. " '[L]iteralness may strangle meaning,' " the Supreme Court has said in its repeated warnings "against the dangers of an approach to statutory construction which confines itself to the bare words of the statute." *Lynch v. Overholser,* 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962) (quoting *Utah Junk Co. v. Porter,* 328 U.S. 39, 44, 66 S.Ct. 889, 90 L.Ed. 1071 (1946). And it is a "cardinal principle" that a court should strive to construe a statute so as to preserve its constitutionality. *See, e. g., Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). Here the reasons for application of this principle are especially strong, for the statute is in all other respects free from any perceived constitutional defects and serves a necessary function in the administration of federal reservations and the protection and care of those who fall within its purview. Moreover, the offending features of the literal language can be easily remedied. The statute as written requires only that the magistrate state his "belief" that the detainee is a "mentally ill person." It does not unduly strain the text to equate "belief" with "probable cause to believe." *Cf. In re Barnard,* 147 U.S.App.D.C. 302, 455 F.2d 1370 (1971) (reading probable cause requirement into Ervin Act). A "mentally ill person" is presently defined by the Act as one suffering from "a psychosis or other disease which substantially impairs [his] mental health." D.C.Code § 21–501, –901 (1973).

The constitutionality of the Act will be saved simply by requiring the magistrate to find probable cause to believe not only that the detainee is mentally ill within the meaning of the Act, but also that he is likely to injure himself or others if not detained. Such a construction has been imposed before on similar statutes without apparent untoward results. *See, e. g., Cross v. Harris,* 135 U.S.App.D.C. 259, 269–70, 418 F.2d at 1105–06.

In accordance with the foregoing, the writ of habeas corpus shall issue: the order of confinement must be reversed and all record of petitioner's confinement expunged. The Federal Reservation Act, as construed, shall stand.

SO ORDERED.